Joyce A. SCHMIDT, Adminisratrix of the Estate of Erin D. Schmidt, deceased; Joyce A. Schmidt, in her own right; and Lindsay Schmidt, a minor, by her Mother and natural guardian, Joyce A. Schmidt,

v.

BOARDMAN COMPANY, a division of TBC Fabrication, Inc.; Boardman, Inc.; TBC Fabrication, Inc.; Coraopolis Volunteer Fire Department; Sinor Manufacturing, Inc., n/k/a Freightliner Specialty Vehicles, Inc.,

and

Peter Jeffress and Michele Jeffress, Individually and on behalf of their minor Daughters, Joeylynne Jeffress and Lauren Jeffress,

v.

Coraopolis Volunteer Fire Department; Boardman Company, a division of TBC Fabrication, Inc.; Boardman, Inc.; Sinor Manufacturing, Inc.; and Freightliner Specialty Vehicles, Inc.

Appeal of Sinor Manufacturing, Inc., n/k/a Freightliner Specialty Vehicles, Inc., and Freightliner Specialty Vehicles, Inc.

Superior Court of Pennsylvania.

Argued April 30, 2008.

Filed Sept. 2, 2008.

Reargument Denied Nov. 7, 2008.

Kim M. Watterson, Pittsburgh, for Sinor, appellant.

Alan H. Perer, Pittsburgh, for Schmidt, appellee.

BEFORE: ORIE MELVIN, BENDER and ALLEN, JJ.

OPINION BY ALLEN, J.:

¶ 1 Sinor Manufacturing, Inc., n/k/a Freightliner Specialty Vehicles, Inc. and Freightliner Specialty Vehicles, Inc. (collectively "Appellants") appeal from the judgment entered against them and in favor of various plaintiffs on their claims of strict product liability and infliction of emotional distress.

¶ 2 Plaintiffs commenced this suit against Appellants asserting that they were liable as the successor companies to the original company that manufactured the defective product. On appeal, Appel-

lants contend that the trial court erred in denying their motion for judgment notwithstanding the verdict ("JNOV"). Particularly, Appellants argue that the evidence was insufficient to establish Appellants' liability under the product line exception to the general rule that a successor company does not incur the liability of the selling company. Appellants further assert that the trial court erred in instructing the jury on, and in excluding evidence relevant to, the product line exception. Appellants additionally claim that the trial court erred in failing to mold the verdict to exclude emotional damages because Plaintiffs commenced their action under a theory of strict product liability and certain plaintiffs did not suffer physical injury. Finally, Appellants contend that the trial court erred in failing to bifurcate the trial into two separate proceedings on liability and damages. Upon review, we conclude that Appellants' assignments of error lack merit. Accordingly, we affirm the judgment.

¶ 3 The trial court succinctly set forth the facts and procedural history of this case as follows:

On August 19, 2004, while responding to a fire alarm, members of the Coraopolis Volunteer Fire Department were operating a fire truck on Mt. Vernon Avenue within the Borough of Coraopolis. Unbeknownst to the fire company, a fire hose was dangling from the side of the truck.

The nozzle [to the fire hose] became briefly lodged under the tire of a parked truck as the hose ran underneath a parked car. The hose [then] became 'taut' [and the] force was so great that it lifted the parked car before the nozzle broke free. The hose and nozzle, which was described as a missile during trial testimony, traveled with enough force to sheer a concrete bird feeder in half before striking three of the plaintiffs. (Tr. at 180).

The nozzle struck the head and face of Joeylynne Jeffress, age 10, causing extensive injuries. Erin D. Schmidt was similarly struck by the dangling house resulting in her death a day later. [ ] Joyce A. Schmidt, Erin's mother, was also struck. Joeylynne, Erin and Joyce were standing in [the] Schmidt's front yard at the time of the accident.

Joeylynne Jeffress' sister[,] Lauren Jeffress[,] age 14, was standing across the street from her sister at the time of the accident and witnessed the trauma to her sister. Lindsay Schmidt, age 13, the sister of Erin Schmidt, similarly witnessed the fatal blow that killed her sister while standing alongside Lauren Jeffress.

The fire truck involved in the Coraopolis accident was manufactured and/or designed by the defendant ... Boardman Company (hereinafter "Boardman"), a division of TBC Fabrication, Inc. (hereinafter "TBC") in May of 1995.

In July of 1995, the defendant Sinor Manufacturing, Inc. (hereinafter "Sinor") purchased substantially all of the assets of [Boardman.] [Under the sales agreement, Sinor's purchase included the rights "to the drawings, designs and engineering used in the production of fire trucks for The Boardman Company, and the name 'Boardman' for use on emergency vehicles."] [A]lthough Sinor did not manufacture the fire truck exactly in question, it was alleged by Plaintiffs that Sinor held itself out to be Boardman, manufactured a "fire wagon" and various emergency vehicles and represented to the public in at least one of its order forms that a fire truck could be manufactured and/or repaired by Sinor. (Tr. 400).

In 1998, Sinor and a certain division of Freightliner, Inc. were merged into a new entity known as Freightliner Specialty Vehicles, Inc., (hereinafter "Sinor/FSV").

\* \* \* \*

The Jeffress plaintiffs filed a Complaint at GD 05–7185, [and] the Schmidt plaintiffs filed a Complaint at GD 05–7191. By Order dated September 9, 2005, the cases were consolidated to GD 05–7191. Plaintiffs sued TBC, the Coraopolis Fire Department, Boardman Inc., and Sinor/FSV. Boardman Inc., was granted summary judgment on August 30, 2006[,] and the action against TBC was discontinued on September 5, 2006. Plaintiffs settled with the Coraopolis Volunteer Fire Department before trial pursuant to a *pro tanto* joint tortfeaser release. Coraopolis Volunteer Fire Department's liability was fixed at $500,000.[1] Defendant Sinor/FSV's cross-claim against the Coraopolis Fire Department proceeded to trial.

A jury trial commenced on September 5, 2006, and proceeded until a verdict was taken on September 14, 2006. The Jury returned a verdict in which it held Sinor/FSV fifty percent (50%) liable and the Coraopolis Volunteer Fire Department fifty percent (50%) liable. The award was approximately four and a half million ($4,500,000) dollars.

Trial Court Opinion (T.C.O.), 7/25/07, at 2–3 (footnote added).

¶ 4 On September 25, 2006, Appellants filed motions for post-trial relief, which included a motion for JNOV on the ground that Plaintiffs failed to establish successor liability under the product line exception. In their post-trial motions, Appellants also requested the granting of new trial, alleg-

ing that the trial court erred in charging the jury on the product line exception. Appellants further sought a new trial, claiming that the trial court abused its discretion in precluding evidence of a transaction between TBC and Boardman, Inc. and evidence that TBC had product liability insurance. In addition, Appellants argued that the trial court erred in denying their motion to bifurcate. Finally, Appellants contended that the trial court erred in failing to mold the verdict to exclude emotional distress damages to certain Plaintiffs because those plaintiffs were bystanders and did not suffer physical injury. On April 4, 2007, the trial court denied Appellants' post-trial motions and thereafter, the trial court granted Plaintiffs' motion for delay damages. On April 23, 2007, judgment was entered against Appellants in the amount of $4,517.073.00.

¶ 5 Appellants now appeal to this Court, raising the following issues for review:

I. Whether judgment in favor of the defendant was required when the plaintiffs' only basis for seeking to impose strict product liability against the defendant was the product line exception to the general rule of no successor liability and when none of the three essential threshold requirements for imposition of liability under the exception were established because (1) the defendant did not purchase all or substantially all of the original manufacturer's assets; (2) the defendant did not continue to manufacture the original manufacturer's product line; and (3) the transaction between the defendant and the original manufacturer did not cause the destruction of the

1. Under Pennsylvania's Political Subdivision Tort Act, the damages recoverable from a local government agency is capped at $500,000. *See* 42 Pa.C.S. § 8553(b).

plaintiff's remedy against the original manufacturer?

II. Whether a new trial is required on the issue of successor liability because the verdict is against the weight of the evidence or based on either or both of the following prejudicial error committed by the trial court: (1) Giving a jury charge on the product line exception that failed to accurately instruct the jury about the three threshold elements that must be proven before successor liability can be imposed, which clearly erroneous instruction misled and confused the jury; and (2) excluding evidence that was directly relevant to negating the existence of the three threshold elements under the product line exception?

III. Whether the trial court erred as a matter of law by refusing to mold the verdict to exclude the emotional distress damages awarded under a strict liability theory to those plaintiffs who did not suffer any physical injury?

IV. Whether the trial court erred in failing to bifurcate the trial of liability and damages where the evidence on damages was likely to evoke the jury's sympathies, making it impossible to dispassionately assess the separate and independent liability questions?

Brief for Appellants at 3.

¶ 6 Appellants are the successor corporation to TBC and their first issue involves application of the product line exception. At the outset, we note that the parties hotly dispute the contours and legal standard governing the product line exception in Pennsylvania. Brief for Appellants at 6–9; Brief of Appellees at 11–18. As such,

we will review our jurisprudence on this area of the law.

 ¶ 7 "With respect to successor liability in this Commonwealth, it is well-established that when one company sells or transfers all of its assets to another company, the purchasing or receiving company is not responsible for the debts and liabilities of the selling company simply because it acquired the seller's property." *Cont'l Ins. Co. v. Schneider, Inc.*, 582 Pa. 591, 873 A.2d 1286, 1291 (2005) (citation and internal quotation marks omitted).

> However, the general rule does not apply and liability attaches to the successor when one of the following is shown: 1) The purchaser expressly or impliedly agrees to assume such obligation; 2) The transaction amounts to a consolidation or merger; 3) The purchasing corporation is merely a continuation of the selling corporation; 4) The transaction is fraudulently entered into to escape liability; 5) The transfer was not made for adequate consideration and provisions were not made for the creditors of the transferor; and, 6) The successor undertakes to conduct the same manufacturing operation of the transferor's product lines in essentially an unchanged manner. The successor is then strictly liable for injuries caused by defects in the product line, even if previously manufactured and distributed by the transferor. [This has been labeled the "product-line" exception.]

*Childers v. Power Line Equip. Rentals*, 452 Pa.Super. 94, 681 A.2d 201, 212 (1996) (*citing Simmers v. American Cyanamid Corporation*, 394 Pa.Super. 464, 576 A.2d 376, 386 (1990)).

 ¶ 8 In *Dawejko v. Jorgensen Steel Co.*, 290 Pa.Super. 15, 434 A.2d 106 (1981), this Court embraced the New Jersey formulation of the product line exception to the rule of successor non-liability. Find-

ing the public policy reasons in support of such an exception persuasive, the *Dawejko* court adopted what is commonly known as the *Ramirez* test:

Where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Dawejko*, 434 A.2d at 110 (quoting and adopting the standard from *Ramirez v. Amsted*, 86 N.J. 332, 431 A.2d 811, 825 (1981)). After surveying case law from other jurisdictions, the *Dawejko* court also paid particular attention to the California Supreme Court's decision in *Ray v. Alad Corp.*, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977). As a policy justification for the imposition of liability upon a successor corporation, the *Dawejko* court restated the three factors analyzed in *Ray*:

(1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Dawejko*, 434 A.2d at 109 (citing *Ray*, 136 Cal.Rptr. 574, 560 P.2d at 9). Ultimately,

the *Dawejko* court formalized the product line exception as follows:

We ... believe it better not to phrase the new exception too tightly. Given its philosophical origin, it should be phrased in general terms, so that in any particular case the court may consider whether it is just to impose liability on the successor corporation. The various factors identified in the several cases discussed above will always be pertinent—for example, whether the successor corporation advertised itself as an ongoing enterprise, [ ]; or whether it maintained the same product, name, personnel, property, and clients, [ ]; or whether it acquired the predecessor corporation's name and good will, and required the predecessor to dissolve,[ ]. Also, it will always be useful to consider whether the three-part test stated in [*Ray* ] has been met. The exception will more likely realize its reason for being, however, if such details are not made part of its formulation. The formulation of the court in [*Ramirez* ] is well-put, and we adopt it.

*Dawejko*, 434 A.2d at 111 (citations omitted).

 ¶ 9 In *Hill v. Trailmobile, Inc.*, 412 Pa.Super. 320, 603 A.2d 602 (1992), a panel of this Court interpreted *Dawejko* and concluded that the three *Ray* factors were mandatory requirements that needed to be established in order for the product line exception to apply. *Id.* at 606.[2] As the *Hill* panel reiterated and pronounced:

In becoming one of the few states to adopt the product-line exception to successor liability, this court explained its change in philosophy as "an attempt to implement the social policies underlying strict products liability." [*Dawejko*, 434

2. *See also Keselyak v. Reach All, Inc.*, 443 Pa.Super. 71, 660 A.2d 1350, 1354 (1995) (concluding that a claimant's inability to re-cover from the original manufacturer is a prerequisite for use of the product line exception).

A.2d at 111 (citation omitted)]. The court explained that strict tort liability for manufacturers of defective products rests on the proposition that

> "the cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business." ... Thus, "the paramount policy to be promoted by the rule is *the protection of otherwise defenseless victims of manufacturing defects* and the spreading throughout society of the cost of compensating them." (citations omitted).

*Id.* at 109 (emphasis added).

In adopting the product-line exception to successor liability for the Commonwealth, the court was particularly concerned that the underlying policy considerations which prompted adoption of the exception be understood and used as a guideline in its application. The court also stated that the product-line exception to the general rule of no liability for successor corporations may *only* be applied when the following three circumstances have *each* been established:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being employed by the successor in the continued operation of the business.

*Dawejko*, 434 A.2d at 109, *quoting Ray v. Alad Corp.*, [19 Cal.3d 22, 136 Cal.Rptr. 574] 560 P.2d 3 (Cal.1977).
The court continued to explain that "[w]e also believe it better not to phrase the new exception too tightly. Given its philosophical origin, it should be phrased in general terms, so that in any particular case the court may consider *whether it is just to impose liability* on the successor corporation." *Id.* at 111 (emphasis added).

*Hill*, 603 A.2d at 606 (discussing *Dawejko* ) (all emphasis in original).

¶ 10 Although *Hill*'s conclusion regarding the three *Ray* factors has been criticized for reading too much into the *Dawejko* opinion, *Hill* did not expressly overrule *Dawejko*. See *Kradel v. Fox River Tractor Co.*, 308 F.3d 328, 332 (3d Cir.2002) (applying Pennsylvania law); *Dale v. Webb Corp.*, 252 F.Supp.2d 186, 190 n. 7 (E.D.Pa. 2003) (applying Pennsylvania law). Instead, the *Hill* panel merely reformulated the product line exception as it was originally outlined in *Dawejko*, by recasting the three *Ray* factors as mandatory-rather than elucidatory—elements of the product line test in Pennsylvania. Despite altering the contours of the product line exception in Pennsylvania, the *Hill* panel reaffirmed the overall flexibility of the *Dawejko* court's formulation of the product line exception. See *Hill*, 603 A.2d at 606. Therefore, *Hill* is compatible with *Dawejko* and we are consequently bound to apply the decisional law of both cases.

¶ 11 Appellants read *Dawejko* and *Hill* to stand for the proposition that in order for the product line exception to apply, a plaintiff must establish each sub-part of the *Ramirez* test and the three *Ray* factors. Brief for Appellants at 22–23. According to Appellants, the *Ramirez* test contains two "essential threshold prerequisites" to the imposition of liability under

the product line exception: 1) the successor obtained all or substantially all of the manufacturing operations of the predecessor and 2) undertook basically the same manufacturing operations of the predecessor. Brief for Appellants at 19, 21. If these two elements of the *Ramirez* test are satisfied, Appellants submit that a plaintiff must then prove the "threshold requirements" of the *Ray* factors. Brief for Appellants at 20–21. Although Appellants cite case law in an attempt to substantiate their proffered interpretation, none of the cases they cite address, let alone hold, that a plaintiff must satisfy both the *Ramirez* test and the three *Ray* factors in order for the product line exception to apply. Indeed, such a construction would run contrary to the plain language of both *Dawejko* and *Hill.*

¶ 12 Plaintiffs respond by relying on the *Dawejko* court's statement that the product line exception should not be phrased "too tightly" to suggest that the product line exception consists of the various factors listed in that case. Brief for Appellees at 14–15, 17. Plaintiffs argue that this Court's "entire impetus for adopting the product line exception was a desire to further the policy of shifting the burden of injuries from the powerless victim to the manufacturer who could spread the risks of such losses." Brief for Appellees at 14. Plaintiffs further contend that the *Hill* panel did not "expand *Dawejko* to add new elements," but rather, was "simply applying" the *Dawejko* decision itself. Brief for Appellees at 16. Upon review, we agree, in part, with Plaintiffs' suggested interpretation of *Dawejko* and *Hill.*

¶ 13 As noted *supra,* in *Hill,* this Court concluded that a plaintiff needs to provide evidence sufficient to establish the requirements of the three *Ray* factors in order for liability to attach to a successor under the product line exception. *Id.* at 606 (stating that the "product-line exception to the general rule of no liability for successor corporations may *only* be applied when the following three circumstances [i.e. the *Ray* factors] have *each* been established.") (emphasis in original). Therefore, as the only stated mandatory requirements of the product-line exception in Pennsylvania, the three *Ray* factors are our central focus. If a plaintiff adduces enough evidence to fulfill these factors, we will then analyze the *Ramirez* test and the various factors stated in *Dawejko* to determine whether the jury, on balance, was provided with sufficient evidence to find that "it is just to impose liability on the successor corporation." *Dawejko,* 434 A.2d at 111. *See Hill,* 603 A.2d at 606 (stating that the "the underlying policy concerns which prompted adoption" of the product line exception are to "be understood and used as a guideline in its application."). Utilizing this analytical framework, we now address Appellants contentions on appeal.

### I. Appellants' JNOV Issue

¶ 14 Appellants' first issue challenges the trial court's denial of their motion for JNOV. The parameters of our review are as follows:

A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference.

Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

*Am. Future Sys. v. Better Bus. Bureau,* 872 A.2d 1202, 1215 (Pa.Super.2005) (citation omitted), aff'd by 592 Pa. 66, 923 A.2d 389 (2007). Further, we will reverse a trial court's denial of a JNOV only where the trial court abused its discretion or committed an error of law that controlled the outcome of the case. *Ty–Button Tie, Inc. v. Kincel and Co., Ltd.,* 814 A.2d 685, 690 (Pa.Super.2002).

### A. The Three Ray Factors

**1. The virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business**

■ ¶ 15 Appellants contend that the evidence was insufficient, as matter of law, to establish that its purchase of assets from TBC did not "cause" the destruction of Plaintiffs remedies against TBC. Brief for Appellants at 33. Appellants assert that TBC decided to go out of business and liquidate its assets before Appellants purchased TBC's assets. Brief for Appellants at 33. According to Appellants, "it was TBC's decision to liquidate, not its agreement with [Appellants], that caused the destruction of the Plaintiffs' remedies against TBC. Simply put, TBC would have gone out of business and ceased to exist even if [Appellants] had not purchased some of its assets." Brief for Appellants at 33. We do not concur in Appellants' assessment. Appellants' argument misconstrues the realities surrounding the business transaction between them and TBC.

¶ 16 In *Kaminski v. W. MacArthur Co.,* 175 Cal.App.3d 445, 220 Cal.Rptr. 895 (1985), the Court of Appeals of California held that Western MacArther Company, a distributor of Johns–Manville asbestos products, was the corporate successor of Western Asbestos Company under the product line exception. Among other things, Western MacArther argued that its purchase of Western Asbestos Company's assets did not "cause" the destruction of the plaintiffs' (the "Kaminskis") remedies against Western Asbestos Company. In rejecting an argument similar to the one which Appellants currently advance, the Court explained:

Western MacArthur further asserts that it did not "cause" the dissolution of Western, but that the company dissolved pursuant to a voluntary decision of its three original directors. Thus, Western MacArthur argues it did not "cause" destruction of plaintiffs' remedies against the original business. Cases adopting or interpreting *Ray* do not impose such a strict interpretation of the causation requirement. The Supreme Court of Washington, following *Ray v. Alad,* has ruled that there need be only a "causal connection" between the successor's acquisition and the unavailability of the predecessor as a potential defendant for the injured plaintiff. The successor need only have "played some role in curtailing or destroying the [plaintiff's] remedies." (*Hall v. Armstrong Cork, Inc.* (1984) 103 Wash.2d 258, 265–266 [692 P.2d 787, 791–792]; accord *In re Related Asbestos Cases* (N.D.Cal.1983) 578 F.Supp. 91, 92–94, affd. *sub nom., Kline v. Johns–Manville* (9th Cir.1984) 745 F.2d 1217 [successor's acquisition need only "contribute" to the destruction of plaintiff's remedies].) Successor liability has generally been denied for a lack of causation in situa-

tions showing no contributory cause in the predecessor's demise, such as when the predecessor sells product line assets but dissolves at a later date and for an independent reason. [citations omitted]. ... MacArthur engineered a takeover whereby its corporate progeny, Western MacArthur, succeeded to the operations, goodwill, customer lists, and a name similar to "Western Asbestos." The essence of the takeover resulted in the transfer of assets and goodwill sufficient to enable Western MacArthur to capitalize on its predecessor's industry and reputation and continue distribution of Johns–Manville asbestos products. We may readily conclude that the transaction was an acquisition of principal assets which caused or at least substantially contributed to the absence of Western from the recovery pool of product liability plaintiffs, and the destruction of Jack and Rose Kaminski's remedies against it.

Western MacArthur insists, however, that had it *not* taken over, Western would have gone into bankruptcy and the Kaminskis would be no worse off now if successor liability were denied. It may be true that had Western MacArthur not acquired the corporation, it would have failed; the fact is it did step in, take the assets and goodwill of Western and cause it to dissolve. Western MacArthur used Western's resources to continue the product line, and in the process extinguished the Kaminskis' remedies against Western.

*Kaminski,* 220 Cal.Rptr. at 902–03.

¶ 17 Here, comparable to the situation presented in *Kaminski,* TBC experienced financial difficulties prior to entering into its transaction with Appellants. In the purchase agreement, TBC sold Appellants all rights and interest "to the drawings, designs and engineering used in the production of fire trucks for the Boardman

Company, and the name 'Boardman' for use on emergency vehicles." R.R. at 975. TBC's stated intention of entering into the purchase agreement was to liquidate its assets so that it could pay its secured and unsecured creditors on a pro rata basis. *Id.* However, once TBC sold its assets to Appellants, it was no longer a going concern; shortly thereafter, TBC dissolved as a corporate entity and its product liability insurance lapsed. *See* N.T. (Trial), at 1111–1113, 1189. As in *Kaminski,* Appellants purchase of TBC's assets and goodwill was sufficient to enable it to capitalize on its predecessor's industry and reputation and continue distribution of "Boardman" products. Regardless of whether TBC previously planned to liquidate its assets, it was the sale of its assets to Appellants and the subsequent formal dissolution of the corporation that caused, or at least substantially contributed to, the destruction of Plaintiffs' remedy against TBC. We conclude, therefore, that there was sufficient, competent evidence to sustain the jury's finding that the transaction between Appellants and TBC contributed to, if not caused, the destruction of Appellants' remedies against TBC. Otherwise, there is no evidence of record to support the proposition that TBC dissolved at a later date for an independent reason. *Cf. Phillips v. Cooper Laboratories, Inc.,* 215 Cal.App.3d 1648, 264 Cal.Rptr. 311, 316–17 (1989) (concluding that successor's acquisition of predecessor did not cause the destruction of plaintiff's remedies against the predecessor because the predecessor continued as a separate viable corporate entity until its dissolution ten years later). Appellants' argument consequently lacks merit.

*2. The successor's ability to assume the original manufacturer's risk-spreading role*

¶ 18 In their brief, Appellants fail to demonstrate how the evidence was in-

sufficient to establish that they were unable to assume TBC's "risk-spreading role." Brief for Appellants at 34. Instead, Appellants simply state that when they purchased TBC's assets, they were "a small company just opening its doors." Brief for Appellants at 34 (citing Tr. (Trial) at 372–73). Under our standard of review, however, we must reject this sole piece of evidence as testimony unfavorable to the verdict winner. *Am. Future Sys.*, 872 A.2d at 1215. Consequently, Appellants' cursory arguments and mere citation to one piece of unfavorable testimony are inadequate to establish that they were entitled to judgment as a matter of law on the issue of risk-spreading. Because Appellants have failed to carry their burden of demonstrating that the evidence was insufficient to support a finding that they were able to assume TBC's risk-spreading role, their contentions on appeal do not entitle them to relief. *See Ragnar Benson, Inc. v. Hempfield Twp. Mun. Auth.*, 916 A.2d 1183, 1191 (Pa.Super.2007) ("It is the Appellant who has the burden of establishing his entitlement to relief by showing that the ruling of the trial court is erroneous under the evidence or the law.") (citation omitted). We must assume, therefore, that the evidence favorable to Plaintiffs was sufficient to sustain the jury's finding that Appellants were able to assume the risk-spreading role of TBC.

*3. The fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being employed by the successor in the continued operation of the business.*

■ ¶ 19 In discussing the final *Ray* factor, the Supreme Court of California stated:

[T]he imposition upon Alad II of liability for injuries from Alad I's defective prod-

ucts is fair and equitable in view of Alad II's acquisition of Alad I's trade name, good will, and customer lists, its continuing to produce the same line of ladders, and its holding itself out to potential customers as the same enterprise. This deliberate albeit legitimate exploitation of Alad I's established reputation as a going concern manufacturing a specific product line gave Alad II a substantial benefit which its predecessor could not have enjoyed without the burden of potential liability for injuries from previously manufactured units. Imposing this liability upon successor manufacturers in the position of Alad II not only causes the one "who takes the benefit [to] bear the burden" (Civ.Code, § 3521) but precludes any windfall to the predecessor that might otherwise result from (1) the reflection of an absence of such successor liability in an enhanced price paid by the successor for the business assets and (2) the liquidation of the predecessor resulting in avoidance of its responsibility for subsequent injuries from its defective products. (See *Turner v. Bituminous Cas. Co., supra,* 397 Mich. 406 [244 N.W.2d 873]; *Cyr v. B. Offen & Co., Inc., supra,* 501 F.2d 1145, 1154; *Shannon v. Samuel Langston Company, supra,* 379 F.Supp. 797, 802; Note, *Expanding the Products Liability of Successor Corporations* (1976) 27 Hastings L.J. 1305.) By taking over and continuing the established business of producing and distributing Alad ladders, Alad II became "an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products" (*Vandermark v. Ford Motor Co., supra,* 61 Cal.2d 256, 262 [37 Cal.Rptr. 896, 391 P.2d 168]).

*Ray,* 136 Cal.Rptr. 574, 560 P.2d at 10–11.

¶ 20 Here, similar to the circumstances in *Ray,* Appellants purchased TBC's draw-

ings, designs and engineering material used in the production of fire trucks for the Boardman Company and also the trade name, "Boardman." R.R. at 975–76. Appellants advertised their products under the "Boardman" tradename, emphasizing the company's 65 years of experience in the fire suppression industry, and admitted that it sought ownership of the Boardman tradename in order to attract customers. N.T. (Trial), at 375–76, 372, 386. Hence, Appellants deliberately exploited Boardman's established reputation as a going concern by advertising and manufacturing products in the general line of fire suppression vehicles. Although Appellants did not continue to manufacture the same exact product—*i.e.* the specific model of the fire truck that injured the Plaintiffs—in *Rawlings v. D.M. Oliver, Inc.*, 97 Cal. App.3d 890, 159 Cal.Rptr. 119 (1979), the Court held that such a requirement was not necessary to find a successor company liable under the product line exception.

¶ 21 In *Rawlings*, the successor corporation purchased the assets and trade name of the predecessor corporation which had manufactured industrial kelp dryers according to the customer's specifications. Because the dryers were more or less a customized product, the successor corporation alleged that it ceased to manufacture that precise line of product. The successor corporation, however, continued the same general line of the predecessor's business. The *Rawlings* court found that failure to continue manufacturing the identical product did not remove the case from the *Ray* rule and imposed liability upon the successor. *See id.* at 124–25 (stating that "manufacturing activity by its very nature involves modification of a product line or elimination of an unprofitable item" and concluding that "the general business continued by the manufacturer" must be considered "and not merely whether a specific line of products was discontinued.").

¶ 22 In this case, Plaintiffs provided evidence that Appellants continued to manufacture the same general line of business as its predecessor, TBC. Initially, under our standard of review, we reject Appellants' documentary and testimonial evidence that it did not manufacturer fire trucks .or continue TBC's product line because this evidence is unfavorable to the Plaintiffs. Consequently, we will only review the evidence of record that is favorable to the Plaintiffs, which essentially consists of four items. First, the Plaintiffs introduced into evidence a sales document prepared by Appellants. On this sales document, located in the heading, "MODULAR BODY," is a check-marked box entitled "Fire." R.R. at 983. Second, Appellants entered into a distribution contract with their manufacturer's representatives. The relevant portion of this contract stated that "the Distributor will represent the following products: ... FIRE ENGINE UNDER 20,000 GWVR ... FIRE TANKER[.]" R.R. at 1117. Third, Mr. Sinor admitted that Appellants sold a "woods truck" which he described as "a little mini fire truck." T.T. at 401. Finally, the record contains photographic depictions of the Coraopolis V.F.D. fire-truck and Appellants' advertised vehicles: a "144 [foot] RESCUE MODEL RS–I FOR LIGHT RESCUE SERVICE" and a "192 [foot] RESCUE MODEL RS–4 FOR MEDIUM/HEAVY RESCUE SERVICE." R.R. at 971–74.

¶ 23 Viewing this evidence and all its reasonable inferences in the light most favorable to Plaintiffs, we conclude that it was sufficient to establish that Appellants continued to manufacture the same general line of business as TBC, *i.e.*, vehicles used in the fire suppression industry. Based upon the evidence adduced at trial, the jury could infer that Appellants manufactured a fire suppression vehicle that

appeared to be sufficiently similar in design to a fire truck, possessing the essential characteristics and functional purpose of a vehicle employed in the fire suppression industry. Therefore, in light of the foregoing, Plaintiffs proffered sufficient evidence to support a finding that it would be "fair" to impose liability on Appellants as a successor corporation. *Cf. Lundell v. Sidney Mach. Tool Co.*, 190 Cal.App.3d 1546, 236 Cal.Rptr. 70, 73, 78 (1987) ("[T]he mere fact that the Sherbondys conducted their proprietorship under the business name of the original manufacturer[ ], standing alone, cannot provide a basis for attaching successor liability." The court found it significant that the Sherbondys only *sold* repair parts to its predecessor's product and did not *manufacture* either the repair parts or the predecessor's product line). As such, we conclude that Plaintiffs' evidence was competent to allow a jury to find that all of the three *Ray* factors were established.

### B. The Ramirez Test and the remaining Dawejko factors

¶ 24 Having concluded that the three *Ray* factors were satisfied in this case, we now survey the *Ramirez* test and the remaining *Dawejko* factors to determine if there were any countervailing reasons that would make it unjust to impose liability on Appellants as successor corporations.

¶ 25 In *Dawejko*, this Court adopted the *Ramirez* test, which provides as follows:

Where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Ramirez*, 431 A.2d at 825. The *Dawejko* court further stated that in addition to the *Ray* factors and the *Ramirez* test, the following other factors are to be considered:

The various factors identified in the several cases discussed above will always be pertinent—for example, whether the successor corporation advertised itself as an ongoing enterprise, [ ]; or whether it maintained the same product, name, personnel, property, and clients, [ ]; or whether it acquired the predecessor corporation's name and good will, and required the predecessor to dissolve,[ ].

*Dawejko*, 434 A.2d at 111 (citations omitted).

### 1. Substantially all of the manufacturing assets

■ ¶ 26 Appellants contend that Plaintiffs failed to prove that it purchased substantially all of TBC's manufacturing assets. Brief for Appellants at 24. In short, Appellants asserts that from a quantitative and/or qualitative perspective, the jury could not infer that Appellants purchased a significant portion of TBC's assets. Brief for Appellants at 25–27. Specifically, Appellants point to evidence of record to highlight what they did not purchase from TBC, namely the "aerial ladders" and "aerial water towers" that TBC installed on its fire trucks. Brief for Appellants at 24–27. The Plaintiffs counter by arguing "that at least in terms of TBC's fire truck business, Appellants purchased substantially all of the meaningful assets." Brief for Appellees at 27. We agree with Plaintiffs.

¶ 27 Here, Appellants bought the exclusive right to use the "Boardman" name on fire vehicles and purchased all of the designs, drawings and engineering material

used in the production of fire vehicles. R.R. at 975. At a public auction, Appellants also purchased electric wire, electric switches, sirens, red lights, gauges, nozzles, and switch panes. N.T., (Trial), at 396, 1091; 1044–45. While Appellants did not purchase the equipment and rights to use the name for certain "ladders" and "water towers," we conclude that the evidence was nonetheless sufficient for the jury to infer that Appellants purchased the assets most germane to Appellants' specific continuation of TBC's product line. *See Bussell v. DeWalt Prod. Corp.*, 259 N.J.Super. 499, 614 A.2d 622, 631 (App.Div.1992) ("Although Black & Decker did not receive all of the exact assets that were transferred by DPC to AMF in 1949, Black & Decker did receive all the assets and information that related to the manufacture of DeWalt radial arm saws."). Accordingly, the Plaintiffs evidence was sufficient to sustain a finding that Appellants purchased "substantially all" of TBC's relevant manufacturing assets.

### 2. *Essentially the same product line*

¶ 28 Appellants argue that Plaintiffs failed to establish that they continued "essentially the same product line" as TBC. Brief for Appellants at 27–31. Appellants assert that Plaintiffs presented no evidence that their vehicles "were the same product as the fire trucks TBC manufactured." Brief for Appellant at 28. According to Appellants, "it is not enough for a plaintiff to suggest that the successor manufactured a product that might be used for a purpose generally similar to the purpose of the original manufacture's product." Brief for Appellant at 29. Appellants, however, do not cite any binding or persuasive authority that supports the proposition that a successor must manufacture the identical product of the predecessor in order to be found liable under the product line exception.

¶ 29 In their brief, Appellants reference case law from this Commonwealth that has stated, described or discussed, in general, the product-line exception. Brief for Appellants at 27. In particular, Appellants stress certain words in these decisions to suggest that a successor must continue to manufacture the identical product as the predecessor. *Id.* We find that Appellants' emphasis on grammatical formation is an exercise in linguistics and, at best, rests upon mere *dicta.* The most pertinent case in this Commonwealth that Appellants cite is *Burnside v. Abbott Laboratories,* 351 Pa.Super. 264, 505 A.2d 973 (1985). *Id.* In that case, the trial court entered summary judgment in favor of Warren–Teed Pharmaceuticals, Inc., finding that it was not the successor to Warren–Teed Products Company. 505 A.2d at 986–87. By affidavit, a corporate officer demonstrated that Warren–Teed Pharmaceuticals, Inc. *"never* manufactured, promoted or marketed" the defective drug "at any time in its history." *Id.* at 987 (emphasis in original). In response, the plaintiffs did not controvert these facts and failed to adduce any evidence that Warren–Teed Pharmaceuticals, Inc. continued to manufacture "essentially the same manufacturing operation" as Warren–Teed Products Company. *Id.* This Court, accordingly, affirmed the trial court's entry of summary judgment in favor of Warren–Teed Pharmaceuticals, Inc. *Id.*

■ ¶ 30 Unlike the plaintiffs in *Burnside,* the Plaintiffs in this case submitted evidence *sufficient to create a genuine issue of material fact* as to whether Appellants undertook "essentially the same manufacturing operation" as TBC. We thus conclude that *Burnside* is distinguishable procedurally and as a matter of comparable evidentiary proof. In the absence of any binding precedent, we find that a plain reading of the *Ramirez* test's requirement

that the successor "undertake[ ] essentially the same manufacturing operation" as the predecessor undermines Appellants' argument significantly, because "essentially" cannot realistically be interpreted to mean "identically." *See Bussell*, 614 A.2d at 631–32 (finding that intervening changes made to a product was not dispositive of the *Ramirez* requirement of undertaking essentially the same line of manufacturing since "the word 'essentially' does not mean 'identically.' "). As detailed and explained above in our discussion pertaining to the third *Ray* factor, we conclude that the evidence was sufficient to permit the jury to find that Appellants undertook "essentially the same manufacturing operation" as TBC.[3] Appellants' arguments to the contrary consequently lack merit.

### 3. The other Dawejko factors

¶ 31 In this case, Appellants acquired the "Boardman" name from TBC and marketed and advertised itself as an ongoing enterprise. Appellants did not maintain TBC's personal property and clients, nor did it require TBC to dissolve, contractually or as a result of a corporate merger.

### C. Conclusion: Appellants' JNOV Issue

¶ 32 In view of the *Ray* factors, the *Ramirez* test and the other *Dawejko* factors, we conclude that the evidence was sufficient to support the jury's finding that Appellants were liable as the product-line successor of TBC. On balance, the jury

was provided with sufficient evidence from which it could find that "it [was] just to impose liability on the successor corporation." *Dawejko*, 434 A.2d at 111. Hence, Appellant's first issue fails. We now address Appellants' remaining issues on appeal.

### II. Appellants' Remaining Issues on Appeal

¶ 33 In their second issue, Appellants submit that they are entitled to a new trial due to errors that occurred during pre-trial proceedings and trial. Specifically, Appellants claim that the trial court committed reversible error on three separate occasions; Appellants' first ground challenges the trial court's instructions to the jury while their second and third grounds attack the trial court's ruling on evidentiary matters.

¶ 34 Appellants initially argue that the trial court erred in denying their motion for a new trial because its jury instructions on successor liability were erroneous as a matter of law and misled the jury. Brief for Appellants at 41.

> Our standard of review regarding jury instructions is limited to determining whether the trial court committed a clear abuse of discretion or error of law which controlled the outcome of the case. Error in a charge is sufficient ground for a new trial if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather

---

**3.** Moreover, Appellants cite a non-binding federal district court decision, *Takacs v. Cyril Bath Co.*, 2006 WL 840350, 2006 U.S. Dist. LEXIS 13913 (W.D.2006) (memorandum), which theoretically supports their position that the successor must manufacture a product identical to the predecessor. Brief for Appellants at 29–30. We, however, conclude that *Takacs* is unpersuasive because that decision runs counter to the plain language of the *Ramirez* test, which only requires that the predecessor undertake "essentially the same

manufacturing operation as the selling corporation." We disagree with the *Takacs* court's decision to read the *Ramirez* test's subsequent phrase, "the same product line," as modifying or adding to the requirement that the predecessor undertake "essentially the same manufacturing operation as the selling corporation." Rather, we find that the phrase, "the same product line," is best interpreted as describing those products that the successor manufactures that are "essentially the same" as the predecessor's products.

than clarify a material issue. A charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to a fundamental error.

*Gorman v. Costello,* 929 A.2d 1208, 1211–12 (Pa.Super.2007) (citations and internal quotation marks omitted). Moreover,

In reviewing a trial judge's charge, the proper test is not whether certain portions taken out of context appear erroneous. We look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party.

*Reilly v. SEPTA,* 507 Pa. 204, 489 A.2d 1291, 1305 (1985).

■ ¶ 35 Appellants' entire argument concerning the trial court's jury charge is premised on the fact that the trial court failed to provide the jury with their own interpretation of *Dawejko* and *Hill* and the product line successor test. *See supra* at 11. Brief for Appellants at 42–45. Since we already rejected Appellants' proffered interpretation and set forth the current law and test to be applied for determining liability under the product line exception, we need not repeat our analysis here. Our review of the trial court's jury instruction, as a whole, leads us to the conclusion that it clearly and accurately conveyed the law of the product line exception to the jury.

■ ¶ 36 In this case, the trial court clearly and accurately instructed the jury on the product line exception to the general rule that a successor corporation does not incur the debts and liabilities of the predecessor. In explaining the law to the jury, the trial court detailed the elements of the product line test in Pennsylvania: the *Ramirez* test, the *Ray* factors and the remaining *Dawejko* factors. N.T., (Trial), at 1258–61. Although the trial court did not instruct the jury that the *Ray* factors "must" be established—per *Hill*—but instead mentioned them together with the other factors, we conclude that this minor omission did not amount to fundamental, prejudicial legal error. As explained above, the evidence was sufficient to satisfy the three *Ray* factors. While *Hill* stands for the proposition that the *Ray* factors must be established, the *Hill* panel never concluded that the jury, as part of its verdict, must specifically find, as a threshold matter, that the three *Ray* factors were present before considering the other factors. We believe that the better interpretation of *Hill* is that a jury is entitled to balance the various factors of the product line test in accordance with *Dawejko*. If a jury does so and returns a general verdict finding a successor corporation liable, its verdict, at a minimum, must be based upon evidence sufficient to support the existence of the three *Ray* factors. In the absence of a special verdict sheet detailing all of the factors of the product line exception, it is irrelevant whether the jury specifically found the existence of the three *Ray* factors, as long as the evidence was sufficient to establish these factors.[4] Consequently, any speculation as to whether the jury was misled by such a legally insignificant omission— which is itself debatable in light of the ambiguous nature of *Hill*—would require us to take a portion of the charge out of its contextual setting and analyze it in the abstract, apart from its entirety. This we

---

4. This is especially true in light of the fact that the first and third *Ray* factors, by their very nature, either encompass or overlap many elements of the *Ramirez* test and the other *Dawejko* factors.

cannot do. As a whole, the trial court's instruction to the jury accurately conveyed the current state of Pennsylvania law and the appropriate factors to be considered when determining a successor's liability under the product line exception. Appellants' argument does not entitle them to relief.[5]

¶ 37 Appellants' next two arguments claim that the trial court committed reversible error in precluding them from introducing evidence at trial.

> [O]ur standard of review when faced with an appeal from the trial court's denial of a motion for a new trial is whether the trial court clearly and palpably committed an error of law that controlled the outcome of the case or constituted an abuse of discretion. In examining the evidence in the light most favorable to the verdict winner, to reverse the trial court, we must conclude that the verdict would change if another trial were granted. Further, if the basis of the request for a new trial is the trial court's rulings on evidence, then such rulings must be shown to have been not only erroneous but also harmful to the complaining parties. Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment. . . .

> Moreover, the admission or exclusion of evidence is within the sound discretion of the trial court. In reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial

court upon a showing that it abused its discretion or committed an error of law. *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 707 (Pa.Super.2000) (citation and internal quotations marks omitted).

¶ 38 First, Appellants contend that the trial court abused its discretion in precluding them from introducing evidence of the transaction between TBC and Boardman, Inc. Brief for Appellants at 48. Appellants claim that evidence of the transaction "significantly prejudiced [their] defense because the jury was deprived of the whole story of TBC's liquidation plan, which demonstrated that TBC's transaction with [Appellants] played only a minor role in the overall plan." Brief for Appellants at 49. Appellants further argue that the excluded evidence was "directly relevant and material" to three issues of successor liability, *i.e.*, substantial purchase of assets, undertaking essentially the same manufacturing operation, and virtual destruction of Plaintiffs' remedies. Brief for Appellants at 50. Besides this statement of "relevancy," Appellants fail to demonstrate precisely how their proffered evidence is material to the issues in the case at bar. Upon review, we conclude that Appellants' proposed evidence was irrelevant and that the trial court properly precluded Appellants from introducing such evidence at trial.

¶ 39 It is black letter law that evidence that is not relevant is not admissible. Pa. R.E. 402. Pennsylvania Rule of Evidence 401 defines "relevant evidence" as that which has "any tendency to make the exis-

---

5. In their brief, Appellants also argue that the trial court erred in instructing the jury that their advertisements may be deemed an "admission" that they are the successor to the Boardman Company division of TBC under the Pennsylvania Rules of Evidence. Brief for Appellants at 47. Appellants, however, only provide three sentences of self-serving argument in support of their assertion and

fail to cite to any authority that substantiates their contentions. Accordingly, we find that this issue is waived. *See Frey v. Frey*, 821 A.2d 623, 629 (Pa.Super.2003) (finding waiver where the appellant failed to cite any authority supporting her position and her entire argument consisted of one paragraph of self-serving allegations and legal conclusions).

tence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401.

¶ 40 A review of Appellants proffered evidence establishes that it sought to introduce evidence that TBC, prior to its transaction with Appellants, sold its "custom steel fabrication assets" to Boardman, Inc.[6] and that Boardman, Inc. continued TBC's "steel fabrication business." Brief for Appellants at 50–51. TBC's transaction with Boardman, Inc., however, concerned a separate and distinct division of TBC, namely its steel fabrication business. Consequently, this evidence is not logically related to the transaction between TBC and Appellants, which involved the sale of assets related to TBC's fire truck division, in order to facilitate Appellant's manufacturing of fire suppression vehicles. For purposes of the product line exception, only those assets that are directly related to the product line at issue are relevant for determining whether the successor purchased substantially all of the predecessor's assets; undertook essentially the same manufacturing operation as the predecessor; and whether the successor's purchase eliminated a plaintiff's remedy. Were we to hold otherwise, then our decision would elevate the form of corporate transactions over their substance, and would make it virtually impossible for a corporation with separate divisions/businesses to produce a successor corporation, if that corporation sold its assets to distinct corporate entities along the lines of its separate divisions/businesses. Given the public policy rational of the product line exception, we decline to fashion such a rule. Hence, we

conclude that evidence of TBC's transaction with Boardman, Inc. was irrelevant (and of no consequence) to any material issue or fact in this case. The trial court, accordingly, did not abuse its discretion in precluding Appellants from introducing this evidence at trial. *See Gibson v. Armstrong World Industries, Inc.*, 648 F.Supp. 1538, 1541 (D.Colo.1986) (finding it insignificant that successor corporation purchased assets that represented only one of the predecessor's divisions rather than all of its divisions).

¶ 41 Second, Appellants contend that the trial court erred in precluding evidence that TBC purchased product liability insurance at the time they originally manufactured the fire truck at issue and sold it to the Coraopolis Fire Department. Brief for Appellants at 38. Appellants claim that this evidence was relevant to the destruction of remedy factor of the product line exception test. Brief for Appellants at 38. Specifically, Appellants maintain that "[t]he fact that the insurance coverage on the fire truck did not continue long enough to provide coverage for the accident in 2004 does not undermine the fact that injuries caused by the truck continued to exist after the transaction between [Appellants] and TBC." Brief for Appellants at 53. We disagree with Appellants' reasoning and conclusion.

¶ 42 Here, the record established that the insurance coverage lapsed before the time of the accident and that Plaintiffs were without a remedy against TBC, which dissolved shortly after its transaction with Appellants. Because the insurance coverage did not exist at the time of

---

6. According to Appellants, as part of TBC's plan of liquidation, TBC created a wholly-owned subsidiary, Boardman, Inc., for the sole purpose of transferring TBC's custom steel manufacturing business, but not its fire suppression business. Brief for Appellants at

9. Appellants claim that this transaction between TBC and Boardman, Inc. occurred four months before TBC sold Appellants the "Boardman" name and other assets related to the fire suppression division. Brief for Appellants at 11.

the accident, evidence of it was irrelevant to the issue of whether Appellants' purchase of TBC's assets contributed to the destruction of Plaintiffs' remedies against TBC. On this basis alone, the cases Appellants cite in support of their position are distinguishable, because, in those cases, a specially created fund or escrow account was created on behalf of the predecessor that provided the plaintiff with monies (and a remedy) at the time the accident occurred. *Cf. Conway v. White Trucks,* 885 F.2d 90 (3d Cir.1989); *Federal Ins. Co. v. Glenn D. Livelsberger, Inc.,* 868 F.Supp. 686 (M.D.Pa.1994); *Shaffer v. South State Mach.,* 995 F.Supp. 584, 586 (W.D.Pa. 1998). In this case, evidence of the insurance coverage does not tend to prove that Plaintiffs had a remedy against TBC following the accident because the insurance coverage was no longer in effect. Appellants' argument therefore lacks merit. As all of the sub-parts of Appellants' second issue fail, Appellants' second issue does not entitle them to relief.

¶ 43 In their third issue, Appellants argue that the trial court erred in failing to mold the verdict to exclude emotional distress damages awarded to Plaintiffs Joyce Schmidt, Lindsay Schmidt and Lauren Jeffress because they witnessed the accident but did not suffer physical injuries. Brief for Appellants at 54. The crux of Appellants' contention is that Plaintiffs' underlying claim was for products liability and that in the absence of a physical injury, Pennsylvania law does not permit recovery for emotional distress damages under a theory of strict product liability. Brief for Appellants at 55. Appellants emphasize that Pennsylvania law has long adhered to the rule that negligence concepts are distinct from the product liability doctrine. Brief for Appellants at 55–58. From these principles, Appellants deduce that the bystander Plaintiffs were not entitled to emo-

tional distress damages. We conclude that Appellants' argument is meritless.

¶ 44 The trial court appropriately addressed this issues as follows:

The Court finds it necessary to speak to [Appellants'] claim that a charge on tortious infliction of emotional distress was improper due to the fact that the underlying cause of action was based on strict product liability rather than negligence. The courts of this Commonwealth have long abandoned the "impact rule" previously needed for a plaintiff to recover in a claim for emotional distress. [*See Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84 (Pa.1970).] The "zone of danger" has been liberally stretched to include plaintiffs that meet the elements enunciated by *Sinn v. Burd,* [486 Pa. 146] 404 A.2d 672 (Pa.1979). Recovery for emotional distress requires that the plaintiff be located close to the accident, that the distress resulted from plaintiff's contemporaneous sensory observation of the accident, and [that] the plaintiff and the victim be closely related. [*Id.* at 685.]

Although subsequent cases have added nuances to the *Sinn* standard, it remains in effect today. The common thread of all of the cases recognizing a claim for emotional distress is the relationship between the victim of the injury and the bystander. The courts have not focused on the underlying tort as a catalyst of the legal argument. Defendant maintains that said cause of action may only be maintained following a finding of negligence, relying on the nomenclature, "negligent infliction of emotional distress." This Court disagrees.

Although there are only a few reported cases in which recovery for emotional distress was awarded where the underlying tort was based on strict product liability, there is precedent. [*See Shep-*

*ard v. The Superior Court of Alameda County,* 76 Cal.App.3d 16, 142 Cal. Rptr. 612 (1977), *see also Walker v. Clark Equipment Co.,* 320 N.W.2d 561 (Iowa 1982) ]. In this case, the facts, although horrific, fit neatly into the factors of *Sinn.* This Court believes [that] after a mother stands in such close proximately as to be struck with the same projectile that killed her daughter and witnessed her daughter's life drain from her body, emotional distress is the inescapable by-product of any underlying tort which caused the injury and thus, should be compensated.

Similarly, although no physical injury was sustained to Lindsay Schmidt [and Lauren Jeffress], [their] award of damages is also supported by *Sinn* and equally justified. Watching one's sister [sustain an injury of that magnitude] and the suffering that resulted therefrom surely constitutes an infliction of emotional distress.

T.C.O., 7/25/07, at 24–25 (footnotes omitted and incorporated into brackets).

¶ 45 We agree with the trial court's analysis and adopt it as our own. Although Appellants cite case law from other jurisdictions that reach a result that is contrary to the trial court's conclusion, Brief for Appellants at 56–57, those cases are either distinguishable, due to distinctions in the common law, or do not possess the persuasive value as *Shepard* and *Walker*.

¶ 46 For example, Appellants cite *Straub v. Fisher and Paykel Health Care,* 990 P.2d 384 (Utah 1999), which concluded that a bystander plaintiff cannot recover for emotional distress in the absence of physical injury when the asserted tort is strict products liability. In that case, however, the Supreme Court of Utah found it extremely significant that it previously rejected the formulation of the tort for emotional distress originally outlined in *Dillon*

*v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968). 990 P.2d at 390. By contrast, in *Sinn,* our Supreme Court adopted the *Dillon* formulation as the standard in which to state a claim for emotional distress. *Sinn,* 404 A.2d at 685 (adopting the *Dillon* rule for emotional distress). Because the jurisdictions in *Shepard* and *Walker* also adopted the *Dillon* formulation of bystander emotional distress claims, *Shepard* and *Walker* are in harmony with the common law of Pennsylvania. As such, *Shepard* and *Walker* are both instructive and persuasive in analyzing the tort of infliction of emotional distress. We conclude that in Pennsylvania, a bystander plaintiff who witnesses injury to a close relative can recover emotional distress damages when the injured person's underlying cause of action is based on strict products liability rather than negligence. *See Straub,* 990 P.2d at 390 ("*Shepard* is a California case in which the *Dillon* rule [ ] was extended from negligent infliction of emotional distress to include strict liability. In *Walker,* [ ] the Iowa Supreme Court also noted that it had previously adopted the *Dillon* rule, and was now simply expanding that to include strict liability.").

¶ 47 Our decision reinforces the tort of infliction of emotional distress as a distinct and separate cause of action in Pennsylvania. Under the *Sinn* standard, Plaintiffs presented sufficient evidence to support a charge to the jury on infliction of emotional distress, and we discern no reason why the bystander Plaintiffs should be denied recovery on the ground that the Plaintiffs who suffered physical injury asserted a claim for products liability. As the *Shepard* court explained:

By alleging the presence of the requirements listed in *Dillon,* petitioners have stated a sufficient cause of action. The injuries complained of are as much a

foreseeable consequence of a defect in design and manufacture as of the negligence of the driver and the 'potentially infinite liability' upon manufacturers, which Ford fears, will not arise by reason of the restrictions imposed by the court in *Dillon* which would apply equally to negligence, strict liability and warranty cases.

*Shepard*, 142 Cal. Rptr. at 615. The trial court, consequently, did not err in failing to mold the verdict to exclude emotional distress damages.[7] Appellants' third issue fails.

¶ 48 In their fourth and final issue, Appellants submit that the trial court erred in failing to bifurcate the trial into separate proceedings of liability and damages. Brief for Appellants at 57–60. Appellants contend that "[b]ifurcation was necessary to guard against prejudice to [them] resulting from jury sympathies engendered by the evidence on damages spilling over into its determination of the liability question[.]" Brief for Appellants at 59. According to Appellants, evidence of the facts and circumstances surrounding the accident "made it impossible for the jury to engage in a sober and reasoned evaluation" of their liability. Brief for Appellants at 59. We disagree.

¶ 49 "The decision whether to bifurcate is entrusted to the sound discretion of the trial court, which is in the best position to evaluate the necessity for such measures." *Gallagher v. Pennsylvania Liquor Control Bd.*, 584 Pa. 362, 883 A.2d 550, 557 (2005).

> [Bifurcation] should be carefully and cautiously applied and [should] be utilized only in a case and at a juncture where informed judgment impels the court to conclude that application of the rule will manifestly promote convenience and/or actually avoid prejudice. Piecemeal litigation is not to be encouraged. Particularly is this so in the field of personal injury litigation, where the issues of liability and damages are generally interwoven and the evidence bearing upon the respective issues is commingled and overlapping.

*Stevenson v. General Motors Corp.*, 513 Pa. 411, 521 A.2d 413, 419 (1987) (citation omitted). "It is almost certain that cases will come before the court where a question as to the injuries has an important bearing on the question of liability." *Id.* (citation omitted).

¶ 50 Here, in order to establish that Appellants were liable under their claim

---

7. The Dissent argues that because some of the bystander Plaintiffs did not suffer "physical harm" as that term is defined in the Restatement (Second) Torts § 402A, they cannot maintain a products liability action, and thus, are unable to recover damages for emotional distress. Dissenting Opinion at 521. First, and contrary to the Dissent's contention, the courts have generally concluded that the definition of "physical harm" encompasses injury that solely manifests itself in the form of emotional shock and disturbance. *See, e.g., Walters v. Mintec/Int'l*, 758 F.2d 73, 77 (3d Cir. 1985) ("[O]ur review of the Restatement leads us to conclude that 'physical harm' can encompass bodily injury brought about solely by the internal operation of emotional distress."). Second, the Dissent fails to consider infliction of emotional distress as an independent cause of action. Contrary to the Dissent's suggestion, the principal issue here is whether the facts of this case fall within the rubric of the tort of infliction of emotional distress, not whether the Restatement (Second) Torts § 402A can be construed to provide damages for emotional harm to bystanders. In point of fact, the bystander Plaintiffs (*i.e.* Joyce Schmidt, Lindsay Schmidt and Lauren Jeffress) never pled a products liability claim against Appellants; rather, they stated a cause of action based solely on the tort of infliction of emotional distress. R.R. at 31–33; 43–44 (Plaintiffs' Amended Complaints) (asserting claims for infliction of emotional distress).

for emotional distress, the bystander Plaintiffs, among other things, were obligated to prove:

(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it;

(2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence;

(3) Whether plaintiff and the victim were closely related as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Mazzagatti v. Everingham*, 512 Pa. 266, 516 A.2d 672, 676 (1986) (citing *Sinn*, 404 A.2d at 685). Therefore, in order to establish liability for tortious infliction of emotional distress, the bystander Plaintiffs necessarily had to introduce evidence of the accident and the injuries sustained by the other Plaintiffs. Since the issues of liability and damages were inextricably intertwined, the trial court did not abuse its discretion in declining to bifurcate the trial into separate proceedings of liability and damages. Hence, Appellants' fourth issue lacks merit.

¶ 51 For the above-stated reasons, we affirm the judgment.

¶ 52 Judgment AFFIRMED.

¶ 53 Judge ORIE MELVIN files a Concurring & Dissenting Opinion.

Concurring and Dissenting OPINION BY ORIE MELVIN, J.:

¶ 1 I concur in the Majority's disposition of each of Appellants' claims on appeal save one: the award of damages for emotional distress.

¶ 2 Although I recognize the gravity of the situation witnessed by Appellees in this case, the Majority as well as the parties acknowledge that no appellate court in Pennsylvania has addressed the issue of whether a party may recover damages for emotional distress in a strict product liability action.[8] Nevertheless, I believe that the precise language of Section 402A of the Restatement, which our Supreme Court adopted in 1966 in *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966), is controlling:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for **physical harm** thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

*Id.* at 427, 220 A.2d at 854 (quoting RESTATEMENT (SECOND) OF TORTS § 402A (1965)) (emphasis added). Further, I conclude that the trial court's reliance on negligence principles in permitting the issue to be determined by the jury was in error. *See, e.g., Bugosh v. Allen Refractories Co.*, 932 A.2d 901, 911 (Pa.Super.2007) (stating that, "negligence concepts have no place in

---

**8.** The claim against Appellants proceeded solely on the basis of strict product liability. *See, e.g.,* Appellees' brief at 46 ("the underlying claim sounds in strict liability rather than negligence"); *id.* at 40, 42–43; N.T. Trial, 9/5–7/06, at 7, 119–20; N.T. Trial, 9/8–11/06, at 745–749; N.T. Trial, 9/12–14/06, at 1194–95, 1252–58, 1307–08.

a case based on strict liability.") (citations omitted).

¶ 3 Hence, I would vacate the judgment and remand solely for the purpose of permitting the trial court to mold the verdict accordingly. For this reason, I respectfully dissent from the Majority's disposition of this single issue.