J-A20038-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ELLEN KLEINER AND YURY KLEINER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellants | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RITE AID CORPORATION, RITE AID | : | No. 2886 EDA 2023 |
| OF PENNSYLVANIA, INC., JOHNSON | : | |
| & JOHNSON, LLT MANAGEMENT, LLC. | : | |
| IMERYS TALC AMERICA, INC., | : | |
| PERSONAL CARE PRODUCTS | : | |
| COUNCIL | : | |

Appeal from the Judgment Entered October 10, 2023
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 170102505

BEFORE: MURRAY, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.*

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED MAY 28, 2026**

Ellen and Yury Kleiner (collectively, "the Kleiners") appeal from the judgment entered in favor of appellees Johnson & Johnson and LLT Management, LLC, (collectively, and for simplicity's sake, "Appellees") contemporaneous with the denial of the Kleiners' post-trial motion. The Kleiners raise various challenges to the trial court's evidentiary determinations, jury instructions, and verdict slip. After thoughtful consideration, we affirm.

The trial court described the factual history of this case as follows:

_____

* Retired Senior Judge assigned to the Superior Court.

[Ellen Kleiner] immigrated from Ukraine to the United States in 1981. While attending Northeast High School in Philadelphia, she noticed her future husband, [Yury]. One day while waiting for the [transit line now known as the L], [Yury] approached [Ellen] and asked her on a date to a wedding of a mutual friend. While she first declined, she later acquiesced to go with him as his date. The 36th anniversary of that date occurred on August 10, 2021, during the trial, and [the Kleiners] had been with each other ever since.

In 2011, [Ellen] went to her OB/GYN for a routine check-up when her doctor, Dr. [Mark] Frisch, informed her that her left ovary was swollen, and she needed to get an ultrasound for further investigation. Following the ultrasound, Dr. Frisch contacted [Ellen] and told her that he did not like the way the ovary looked on the ultrasound[,] and she needed surgery as soon as possible. [Ellen] had surgery to remove the ovary at [what is now Jefferson Einstein Philadelphia Hospital]. [Doctor] Frisch sent the ovary to an oncologist but assured [Ellen] that he was just following procedure[,] and she should[ not] worry. However, three days later[,] Dr. Frisch called back and informed [Ellen] that she had ovarian cancer[,] and he wanted to speak to her and [Yury] to discuss the next steps of treatment. The next steps included a hysterectomy and, most likely, some form of chemotherapy.

[Doctor] Frisch told [Ellen] that of all his patients, she was the last one he would expect to develop ovarian cancer. [Ellen] had no known risk factors associated with ovarian cancer like smoking or issues with childbirth. Three weeks following the first surgery, [Ellen] had her hysterectomy and followed that up with chemotherapy. After enduring two surgeries, [Ellen] testified that the chemotherapy was the worst of all the treatment she received. She received both intravenous treatments, through her veins, and intraperitoneal treatments, where the chemo[therapy] treatment is surgically inserted into the body cavity. Ultimately, [Ellen] received eighteen treatments of chemotherapy that made her fatigued and emotionally strained.

[As part of her history, Ellen] began daily perineal use of Johnson & Johnson Baby Powder (["]Baby Powder["]) when she was sixteen [years old]. She would apply the Baby Powder to her panty liner as well as under her breasts. [Ellen] would also apply Baby Powder to her tampons prior to using them. She exclusively used Johnson & Johnson brand. [Ellen] testified that she began buying Baby Powder because she saw commercials showing mothers with their children using Baby Power and a narrator stating that Baby

Powder is good for you. The only time that she paused her use of Baby Powder was while she received her treatment for ovarian cancer as the doctors told her to stop using products that may affect the treatment. In 2016, [Ellen] was sitting in the waiting room of her family physician when a report came on the television mentioning a link between Baby Powder and ovarian cancer. At that moment, [Ellen] began to associate her cancer with her use of Baby Powder, and she threw out any remaining containers of Baby Powder she could find in her house. Later, [Ellen] found several smaller containers of the Baby Powder in her house and provided them to [her] counsel for use as exhibits.

[As described at trial, t]alc is a mineral composed primarily of magnesium and silicon. It comes in two forms, platy form and fibrous form. [The Kleiners] allege that fibrous talc is carcinogenic to humans[,] and it can be found in tissue samples of those who regularly use Baby Powder. Talc is mined and is found in rocks of various sizes. These rocks are then ground up to make talc powder. Depending on the intended use of the talc, the powders['] physical properties can vary.

Trial Court Opinion, 2/8/24, at 1-4 (record citations omitted).

The Kleiners advanced several causes of action against the Appellees, namely strict liability and negligence, premised on product liability and the assertion that Appellees were a factual cause of Ellen's cancer.[1] Germane to the Kleiners' issues on appeal, the court made various evidentiary rulings and gave jury instructions, as follows:

[the court] precluded or limited the testimony of two of [the Kleiners'] expert witnesses due to differing circumstances. First, Dr. [Rebecca] Smith-Bindman, an epidemiologist, was called to offer an opinion on the association between fibrous talc and ovarian cancer. In order to reach her conclusions, Dr. Smith-Bindman reviewed 10 epidemiological studies on the issue and tasked a colleague, Dr. [Jane] Hall, to conduct a statistical analysis of the female participants of the study who used talc powder daily.

_____

[1] Yury was a party to the case given his assertion of a loss of consortium claim.

- 3 -

[Doctor] Hall, a biostatistician, [thereafter] shared the results with Dr. Smith-Bindman, who then used the results to form her opinion. During cross-examination, [Appellee's counsel] asked Dr. Smith-Bindman about the formula used to reach the conclusions she reached[,] and she did not know. Instead, Dr. Smith-Bindman said, "[T]his is my guess at the formula [Dr. Hall] used . . ." or "it's my interpretation of what I think [Dr. Hall] did." During the jury charge, [the trial court] decided to give a curative instruction essentially striking the testimony regarding the statistical analysis from the record. Specifically, the instruction stated:

> "[The trial court] determined that Dr. Smith-Bindman should not have been permitted to offer these opinions in her testimony because she relied upon the statistical analysis of Dr. [] Hall, who did not testify. Accordingly, [the trial court is] instructing you to disregard only that portion of Dr. Smith-Bindman's testimony that you heard and any documents that you were shown about Dr. Smith-Bindman's systemic review and meta-analysis . . ."

Second, the supplemental report of [the Kleiners'] expert[,] Dr. Mark Rigler[,] was precluded from being used at trial. [Doctor] Rigler is a microbiologist and electron microscopist and was called to testify regarding the association between fibrous talc and ovarian cancer. At trial, he was permitted to testify to his original expert report in which he concluded that the fibrous talc was found in the tissue samples of women with ovarian cancer. However, he was precluded from testifying to the new opinion in a supplemental report that was produced about a month before trial. In that report, Dr. Rigler concluded that [Ellen] had been exposed to 42,340 grams of fibrous talc throughout her usage of Baby Powder. [The trial court] precluded this new opinion where it was outside the scope of the original report and its untimely disclosure was prejudicial to [the Appellees].

Plaintiffs objected to the testimony of two expert witnesses called by [the Appellees,] but [the trial court] overruled [the Kleiners' objection] and allowed the experts to testify. First, Dr. Mark Sanchez, a geologist and mineralogist, testified to the carcinogenic nature of fibrous talc and whether such talc was present in the samples. [The Kleiners] objected to Dr. Sanchez's opinions regarding testing methods for asbestiform talc and fibrous talc. [The trial court] permitted those opinions because they were within the scope of Dr. Sanchez's two reports and

responded to the testimony of [the Kleiners'] expert Dr. Rigler. Second, [the Kleiners] objected to the testimony of Dr. Jeffrey Boyd, a cell biologist. [Doctor] Boyd amended his report a week prior to trial and added a paragraph with the title "Talc is Not a Recognized Carcinogen." In this paragraph, Dr. Boyd referred to three studies: (1) Shukla study; (2) Hillegass study; and (3) Wylie study. [The trial court] found that even though the amendment was made late, the opinion of Dr. Boyd contained in that paragraph [was] permissible where it was rebutting evidence presented by [the Kleiners].

Prior to trial, [the Appellees] filed a motion *in limine* to exclude internal documents produced by Imerys. Imerys, formerly known as Rio Tinto Minerals and Luzenac, was [the Appellees'] sole provider of talc during all relevant periods. [The Kleiners] sought to use the documents to show that Imerys was aware of the harms talc could cause and were actively lobbying the government to continue their manufacture and sale of talc. [The Kleiners] then planned to use this information to illustrate that [the Appellees] were aware of the potential harms of talc[,] yet they continued to produce Baby Powder. While [the trial court] denied the motion, it was made clear that this decision could be reconsidered when [the Kleiners] sought to introduce specific documents at trial. On August 19, 2021, [the trial court] heard argument regarding the admissibility of specific Imerys documents and reconsidered the earlier ruling. The reconsideration and reversal of the previous decision were based on case law provided by [the Appellees] that the ***Noerr-Pennington*** doctrine is applicable and bars the introduction of the documents where they show proper First Amendment activity on behalf of Imerys. These documents are otherwise hearsay[,] and no exception applied.

Throughout the course of the trial, [the court] excluded three other pieces of evidence. First, [it] precluded a report from Health Canada as hearsay. It is a report that was produced by a foreign organization on the effects of talc powder. [The Kleiners'] experts relied upon and discussed the same data that the report reviewed[,] and therefore[,] it would also be cumulative. Second, [the court] excluded evidence that other talc powder manufacturers placed ovarian cancer warnings on their products. The proposed evidence was of two labels from separate manufacturers that contained a warning. However, these warnings were placed on the labels after [Ellen] was diagnosed with ovarian cancer. Therefore, the warnings were not relevant to

the industry standard at the time of [Ellen's] injury. Finally, [the court] excluded any evidence from being presented on [Appellees'] discontinuance of manufacturing Baby Powder. It is irrelevant to the issues of the case[;] therefore[,] evidence of that nature was excluded.

During the jury charge, the jury was instructed that "[i]n a case like this, plaintiffs must establish with expert testimony that Johnson's Baby Powder was a factual cause of the plaintiff's injuries. In other words, that her perineal genital use of this product was a cause of her ovarian cancer. If the plaintiffs do not prove this through expert testimony, you must find for the defendants." Later in the jury charge, [the trial court] reviewed the verdict sheet with the jury, explaining each question. The first question on the verdict sheet stated: "Have Plaintiffs proven by a preponderance of the evidence that JOHNSON'S ® [sic] Baby Powder was a factual cause of Mrs. Kleiner's ovarian cancer?" Following deliberations, the jury unanimously answered no to the first question and reached a verdict in the case.

*Id.* at 4-7 (record citations omitted; some alterations in original).

After the filing and subsequent denial of their post-trial motion, the Kleiners timely appealed to this Court and, after being directed, filed a timely concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).

On appeal, they present three issues, with some sub-issues, which we have reproduced *verbatim*:

1. Did the trial court err as a matter of law or otherwise abuse its discretion in preventing the Kleiners from having the jury consider the following evidence to prove that Appellees' Baby Powder was a factual cause of Ellen's ovarian cancer:

    a. by striking the testimony of Dr. Smith-Bindman, the Kleiners' epidemiology expert, that a woman's daily use of talcum powder in her genital area produced a statistically significant risk of ovarian cancer;

- 6 -

b. by preventing the Kleiners' expert microbiologist and analytical microscopist, Dr. Rigler, from testifying about Ellen's likely quantitative exposure to talc throughout the duration of her usage of Appellees' Baby Powder, based on supposed unfair surprise to the defense, while simultaneously permitting two defense experts (Dr. Sanchez and Dr. Boyd) to testify beyond the fair scope of their expert reports;

c. by excluding otherwise relevant and admissible evidence concerning: the recent [Health Canada Assessment] that a statistically significant causal association existed between perineal talc use and ovarian cancer; other talc-based body powder manufacturers' warnings pertaining to the risk of ovarian cancer from perineal use; and Appellees' 2020 decision to discontinue selling its talc-based Baby Powder, the very product at issue in this case;

d. by excluding on a wholesale basis documents created by Imerys, Appellees' exclusive talc supplier during all periods relevant to Ellen's use of the product, demonstrating that Appellees and Imerys worked together to suppress emerging science linking talc to ovarian cancer and to thwart any anticipated regulation of talc and any recognition that talc is carcinogenic to humans[?]

2. Did the trial court harmfully prejudice the Kleiners by waiting until it delivered its jury instructions at the close of the case to instruct the jury to disregard a portion of Dr. Smith-Bindman's testimony from weeks earlier during the trial, and by further delivering a jury charge that misled the jury into believing that the Kleiners lacked necessary expert support to establish factual causation?

Whether the trial court's decision to use a non-traditional jury verdict slip, over the Kleiners' objection, placing the question of factual causation at the forefront, harmfully prejudiced them, necessitating a new trial here?

Appellants' Brief at 7-8 (some name alterations).

The Kleiners' first contention contests the court's exclusion of certain

evidence they regard as vital to their case-in-chief, which they have broken into four separate categories: (1) Dr. Smith-Bindman's testimony; (2) Dr. Rigler's testimony; (3) the "Health Canada Assessment"; and (4) the alleged concerted effort, in documentary and testimonial form, of the Appellees and Imerys to "suppress" the link between talc and ovarian cancer. By not being able to present any of this complained-of evidence to the jury, they suggest that they have suffered prejudice, which, in their summation, warrants the grant of a new trial.

In addressing their varied evidentiary challenges, we start by noting that, having denied the Kleiners' post-trial motion for a new trial, such a decision "whether to grant a new trial, in whole or in part, rests in the sound discretion of the trial court." ***Mendralla v. Weaver Corp.***, 703 A.2d 480, 485 (Pa. Super. 1997) (*en banc*). As an appellate court,

> [o]ur standard of review when faced with an appeal from the trial court's denial of a motion for a new trial is whether the trial court clearly and palpably committed an error of law that controlled the outcome of the case or constituted an abuse of discretion. In examining the evidence in the light most favorable to the verdict winner, to reverse the trial court, we must conclude that the verdict would change if another trial were granted. Further, if the basis of the request for a new trial is the trial court's rulings on evidence, then such rulings must be shown to have been not only erroneous but also harmful to the complaining parties. Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment[.]
>
> Moreover, the admission or exclusion of evidence is within the sound discretion of the trial court. In reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law.

- 8 -

*Schmidt v. Boardman*, 958 A.2d 498, 516 (Pa. Super. 2008).

In analyzing the Kleiners' complained-of evidentiary rulings *seriatim*, we begin with consideration of Dr. Smith-Bindman's testimony. The Kleiners identify Dr. Smith-Bindman as their epidemiology expert who, *inter alia*, "testified about her systematic review of the epidemiologic literature regarding daily use of talcum powder in the genital area." Appellants' Brief at 22. Doctor Smith-Bindman's systematic review of that literature "demonstrated a 1.43 relative risk, which was statistically significant." *Id.* at 23.[2] The Kleiners assert that this finding was among their "most significant evidence to establish factual causation." *Id.* Notwithstanding the significance of this piece of evidence and fact that she "testified to the design[3] and results of her

_____

[2] Doctor Smith-Bindman opined that, based on her findings, "the relative risk of ovarian cancer was 43 percent higher in women who were daily users of talcum powder with a relatively narrow confidence interval." N.T. Morning Session, 8/27/21, at 102.

[3] With regard to design, the Kleiners indicate that Dr. Smith-Bindman

> described how she: 1) designed the systematic review to focus on women with serous ovarian cancer who regularly used talcum powder; 2) defined the type of talcum powder exposures to be studied, i.e., genital or perineal application; 3) defined regular use to be women who used greater than 3 times per week; 4) performed a comprehensive search of the medical literature; 5) evaluated all study publications for inclusion in the systematic review; and 6) analyzed and extracted necessary data from the qualifying studies and compiled the information in a spreadsheet.

Appellants' Brief at 24.

systematic review," *id.*, the jury was ultimately instructed to disregard that portion of her testimony.[4]

Under Pennsylvania Rule of Evidence 702(c), reflecting Pennsylvania's adoption of the ***Frye***[5] standard, an expert's methodology must be generally accepted in the relevant field. ***See*** Pa.R.E. 702(c). In addition, "[a]n expert

_____

[4] Following cross-examination, the Appellees moved to strike Dr. Smith-Bindman's testimony. A hearing was thereafter held, and Appellees' motion was granted. In connection with that ruling, the court instructed the jury as follows:

> During the testimony presented on August 26th and 27th of 2021 — it seems like forever since we started this trial. But back on August 26th and 27th, Dr. Smith-Bindman testified about her opinions regarding a systemic review and meta-analysis concerning ten studies about women who used talc daily. I have determined that Dr. Smith-Bindman should not have been permitted to offer these opinions in her testimony because she relied upon the statistical analysis of Dr. Jane Hall, who did not testify.
>
> Accordingly, I am instructing you to disregard only that portion of Dr. Smith-Bindman's testimony that you heard and any documents that you were shown about Dr. Smith-Bindman's systemic review and meta-analysis, including a couple of slides, slides 34 and 35, as well as all related testimony.
>
> You should proceed as if the portion of Dr. Smith-Bindman' testimony regarding her systemic review and meta-analysis were never presented at this trial and that may not be part of the evidence that you consider in deliberations. However, you can consider the other opinions from Dr. Smith-Bindman as you would any other expert.

N.T. Afternoon Session, 9/22/21, at 26-27.

[5] ***See Frye v. United States***, 293 F. 1013 (D.C. Cir. 1923).

may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Pa.R.E. 703; *see also* Pa.R.E. 705 ("If an expert states an opinion the expert must state the facts or data on which the opinion is based."). Nevertheless, an expert may not "merely parrot[] the findings and impressions" of a non-testifying expert, as such testimony would constitute inadmissible hearsay. *Woodard v. Chatterjee*, 827 A.2d 433, 445 (Pa. Super. 2003); *see also* *Oxford Presbyterian Church v. Weil-McLain Co., Inc.*, 815 A.2d 1094, 1102 (Pa. Super. 2003) (highlighting that an expert witness may not merely act as a conduit or transmitter of an extrajudicial source's content).

The court concluded that the contested portion of Dr. Smith-Bindman's testimony constituted inadmissible hearsay:

> Dr. Smith-Bindman's testimony and opinions were based partially on the analysis of her colleague, Dr. Hall. [Doctor] Smith-Bindman's opinion was based on the systematic analysis of ten epidemiological studies regarding the carcinogenic nature of talc powder and perineal use. This analysis was done by Dr. Hall. [Doctor] Hall never produced an expert report and was not called to testify at trial regarding the statistical analysis. When Dr. Smith-Bindman was cross-examined about the analysis, she was unable to describe the steps taken by Dr. Hall. Instead, she vacillated between her guess as to Dr. Hall's formula and her interpretation of the results from Dr. Hall's formula.

Trial Court Opinion, 2/8/24, at 12 (record citations omitted).[6] The court held that Dr. Smith-Bindman's testimony ran afoul of Rule 705 because she did not "provide the facts and data she relied upon to reach her opinion. However, . . . she [did] not know what steps Dr. Hall took to produce the data upon which [she] based her opinion." *Id.* at 13.[7] As such, Dr. Smith-Bindman was "merely parroting" Dr. Hall's opinion "regarding the results of the statistical analysis[] in order to form her opinions[.]" *Id.* As Dr. Hall did not testify, the factfinder was left "with the inability to determine the credibility of Dr. Hall's analysis." *Id.* Ultimately, the court instructed the jury to disregard Dr. Smith-Bindman's testimony as to her "opinions regarding a systemic review and meta-analysis concerning ten studies about women who used talc daily." N.T. Afternoon

_____

[6] From the bench, contemporaneous with its decision to tell the jury to disregard Dr. Smith-Bindman's testimony as it pertained to Dr. Hall's analysis, the trial court stated:

> but when you get into calculations this complicated and the witness can't explain how they were done, I don't think satisfactorily, then it is just parroting. Then it is just somebody told me that these are the numbers so I'm telling you they're the numbers and I really respect her so I'm going to go with her numbers.
>
> And that's not the same as all the literature that talks about experts relying on hearsay and various studies.

N.T. Morning Session, 8/30/21, at 155.

[7] The court found the relationship between Dr. Hall's work and Dr. Smith-Bindman's testimony to go beyond that of the latter doctor simply "using a calculator[.]" N.T. Afternoon Session, 8/27/21, at 39-40.

Session, 9/22/21, at 27. The court explained to the jury that it "determined that Dr. Smith-Bindman should not have been permitted to offer these opinions in her testimony because she relied upon the statistical analysis of Dr. [] Hall, who did not testify." *Id.*

Relatedly, Appellees concede that Dr. Smith-Bindman, as an expert epidemiologist, "was allowed to opine, based on her informed judgment, that epidemiological studies support finding that talc use causes ovarian cancer." Appellees' Brief at 19. However, Appellees emphasize that the Kleiners did not call Dr. Smith-Bindman *as a biostatistician*, which created the evidentiary tension between Dr. Hall's unpublished meta-analysis and Dr. Smith-Bindman's testimony predicated thereon. *See id.* at 20-21.

At trial, Dr. Smith-Bindman testified that she "abstracted the data from the studies, and then the data, under [her] direction, were analyzed by" Dr. Hall. N.T. Morning Session, 8/27/21, at 89. However, Dr. Smith-Bindman later conceded that Dr. Hall had at least some level of autonomy in which studies to utilize in reaching her statistical conclusions. *See id.* at 94-96 (establishing that Dr. Smith-Bindman generally identified for Dr. Hall which studies to consider, but that Dr. Hall specifically ascertained which studies should be included and thereafter analyzed). When asked, Dr. Smith-Bindman did not know the formula Dr. Hall used in her analysis and provided her "interpretation" thereof. N.T. Afternoon Session, 8/27/21, at 19 ("[T]his is my best guess at the formula [Dr. Hall] used, because this is the formula for an

interval for a risk ratio to calculate a confidence interval."); *see also id.* at 32 ("I could only possibly write what I think is the right approach to doing it."). In addition, Dr. Smith-Bindman did not check Dr. Hall's accuracy for "nine of the ten" calculations that were made. *Id.* at 21. Doctor Smith-Bindman also indicated that Dr. Hall had to make her own judgments in connection with her mathematical computations. *See id.* at 33. Nevertheless, in Dr. Smith-Bindman's words, she "gave [Dr. Hall] the data, and [Dr. Hall] gave [her] back the numbers from running a [Cochrane Collaboration] random-effects model in [the software program] SAS using the input that [she] gave her." *Id.* at 35.

In terms of the statistical work Dr. Hall performed, as elucidated through Dr. Smith-Bindman's testimony, of the ten studies utilized, eight of them had a confidence interval that "broke" 1. *Id*. at 30.  Doctor Hall placed the results of those ten studies into a model, which came to a number "that was 1.43 with a confidence interval of 1.15 and 1.71[.]" *Id.* However, as to the formula that Dr. Hall used, Dr. Smith-Bindman could not write it out "without a whole lot more documentation." *Id.* at 31; *see id.* at 32 (stating, further, that she could "probably write down the equation" with enough paper). As a part of Dr. Hall's process, she "documented" "assumptions" that were made. *Id.* at 33. In particular, Dr. Smith-Bindman mentioned "the distribution being nonskewed and it being sampled in a certain way." *Id.* Doctor Hall also had to "weight" the studies "by something that's inverse to the standard error [amounting to] basically [being] weighted by the sample size." *Id.* at 31.

After our review, we conclude that it was not an abuse of discretion or error of law for the trial court to find that, Dr. Smith-Bindman's testimony, in reference to Dr. Hall's work, impermissibly forayed into the repeating of "another's opinion or data without bringing to bear [her] own expertise and judgment." **Woodard**, 827 A.2d at 444 (citation omitted). Nevertheless, the Kleiners rely on a relatively recent decision of this Court, **Commonwealth v. Vance**, 316 A.3d 183 (Pa. Super. 2024), for the proposition that "expert witnesses regularly and permissibly rely on published data in reaching their expert opinions, even though the expert played no role in determining how that published data was created nor had any specific insight into its creation or its reliability." Appellants' Brief at 29.

In **Vance**, we held that a police officer "qualified as an expert in historical call analysis" was permitted to provide an opinion on "Google GPS location records" because that officer's testimony was "based on data which Google made him aware of and which is regularly relied on by similar experts." **Vance**, 316 A.3d at 194. We found that Rule 703 did not require the officer to ascertain "how Google's GPS location information is obtained, stored[,] and/or verified for accuracy. **Id.**

Here, as distinguishable from **Vance**, which determined that GPS records, in effect, constituted "facts or data" within the meaning of Rule 703, Dr. Smith-Bindman admitted, *inter alia* as it pertained to Dr. Hall's work, that Dr. Hall "most assuredly[]" utilized "judgments" and "assumptions" in her

- 15 -

calculations and further guessed at formulas that she used, creating ambiguity as to whether Dr. Hall's work, as employed by Dr. Smith-Bindman, can be viewed in the same light. *See* N.T. Afternoon Session, 8/27/21, at 33. Nevertheless, as the court found, Dr. Smith-Bindman's analysis involved an interpretative element, requiring her to, in essence, guess at the underpinnings of at least some of Dr. Hall's computations, computations of which formed vital parts of Dr. Smith-Bindman's own testimony. This lack of clarity was obfuscated by a lack of any testimony by Dr. Hall and rendered the Appellees without material recourse: the ability to cross-examine the nuances of Dr. Hall's calculations. Moreover, unlike Google's data, which was created in the normal course of its business, Dr. Hall's calculation was completed for the express purpose of this litigation, as a tool to be used in Dr. Smith-Bindman's own testimony. Finally, *Vance* is distinguishable insofar as that case stands for the proposition that experts may rely on published data in forming their own opinions, whereas, here, Dr. Hall's calculations were unpublished. Therefore, the Kleiners have failed to demonstrate that Dr. Smith-Bindman's testimony regarding Dr. Hall's work constitutes reliance on "facts or data" permitted within the context of Rule 703, and no relief is due on this challenge.[8]

_____

[8] Additionally, as Appellees point out, the Kleiners have failed to adduce any discrete prejudice from the court's exclusion of Dr. Smith-Bindman's contested testimony. *See Crespo v. Hughes*, 167 A.3d 168, 186-87 (Pa. Super. 2017) *(Footnote Continued Next Page)*

At their second contested evidentiary point within their first issue, the Kleiners argue that the court "improperly precluded [their] microbiologist and analytical microscopist[, Dr. Mark Rigler,] from testifying about [Ellen's] likely quantitative exposure to talc throughout the duration of her usage[.]" Appellants' Brief at 34. However, the Kleiners allege, the court allowed two of Appellees' experts to testify beyond the fair scope of their expert reports. We disagree.

Pennsylvania Rule of Civil Procedure 4003.5(c) establishes that "the direct testimony of [an] expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings[.]" Pa.R.Civ.P. 4003.5(c). There is no "hard and fast rule" to determine whether "a particular expert's testimony exceeds the fair scope of his or her pretrial report[.]" **Woodard**, 827 A.2d at 442 (citation omitted). Instead, we "must examine the facts and circumstance of each case." **Id.** In particular, we look to "whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from making a meaningful

_____

(establishing that erroneous evidentiary rulings require reversal _only if_ they cause prejudice). In summary, Dr. Smith-Bindman was permitted to: (1) broadly opine that regular use of talcum powder increased the risk of ovarian cancer; and (2) testify, unencumbered, as to existing studies and meta-analyses that purportedly demonstrated talcum powder's increased risk of ovarian cancer. **See** Appellees' Brief at 31. Therefore, the thrust of her testimony remained viable for the jury to hear.

response, or which would mislead the adversary as to the nature of the appropriate response." *Id.* (citation omitted).

The trial court addressed the admissibility of Dr. Rigler's proposed expert testimony as follows:

> [In accordance with the existing case management order, the Kleiners] were required to submit their expert reports no later than October 7, 2019. [Appellees] were required to submit their expert reports no later than November 4, 2019. While his original report was filed in a timely manner, Dr. Rigler's supplemental report was filed on July 16, 2021, almost two years after the deadline had passed and about one month prior to trial. The supplemental report contained a new extrapolation of [Ellen's] Baby Powder use throughout the course of her life. The calculation reached a total of 42,340[ grams] of talc powder exposure. The key variable in the equation was the amount, in grams, of Baby Powder [Ellen] used a day. For this variable[,] Dr. Rigler used 4 grams, the number used in a study of Baby Powder.
>
> [The c]ourt correctly precluded Dr. Rigler from testifying to the new opinion found in the supplemental report. It would be prejudicial to [Appellees] to allow this late[-]disclosed opinion to be presented at trial because it was not subject to the previous *Frye* hearings in this matter and therefore [Appellees] did not have the opportunity to challenge it during discovery. At that point in the litigation, the validity of the extrapolation could have been determined by the court. Furthermore, [the Kleiners] were not prejudiced by the exclusion for two reasons. First, the new opinion constitutes an arithmetic calculation and is not the proper purview of expert opinions where it does not require specialized knowledge to formulate the opinion. The calculation was simple, basic mathematical computations comprised of multiplication.
>
> Second, [the Kleiners] presented evidence of the amount of talc present in the tissue samples through their expert Dr. [John] Godelski. [Doctor] Godelski studied [Ellen's] tissue samples under a microscope and was able to extrapolate that there were approximately eight-hundred particles of talc in one lymph node alone. With evidence of the actual level of particles present in the tissue, extrapolated for scale, already presented, Dr. Rigler's proposed testimony regarding how much Baby Powder [Ellen]

used throughout her life is not only speculative but also cumulative: additional evidence that simply supports evidence already presented at trial. Had the supplemental report been produced in a timely manner, [the c]ourt could still have properly excluded the opinions therein based on Pennsylvania Rule of Evidence 403, preventing the presentation of needlessly cumulative evidence. . . . [Here, the Kleiners] sought to present evidence on [Ellen's] total exposure through two sources, namely Dr. Rigler and Dr. Godelski. While Drs. Rigler and Godelski would have stated it in slightly different ways, it is clear that this evidence is cumulative[.]"

Trial Court Opinion, 2/8/24, at 14 (citations and quotation marks omitted).

Distilled down, the Kleiners' argument is that Dr. Rigler's report "contained nothing new but straight math[.]" Appellants' Brief at 35. In other words, the report "contained no new analysis or opinions not previously disclosed to the [Appellees.]" *Id.*[9]

However, Appellees respond by indicating that Dr. Rigler's original report merely analyzed "72 historical samples of cosmetic talc from cosmetic companies." Appellees' Brief at 32. The original report *did not* mention Ellen nor "offer any opinions about how much talc, fibrous talc, or asbestos any individual would be exposed to from using cosmetic talc products." *Id.*

_____

[9] The Kleiners summarized the thrust of the supplemental report as follows:

[Predicated on the assumption of Ellen's daily use,] Dr. Rigler just made one calculation, 365 times 29 years times 4 grams. And that's what he has previously testified would be a typical application, that's 4 grams. That's well known to them. So[,] the substance of the opinion is 365 times 29 years times 4 grams.

Motions Argument, 8/17/21, at 19.

Nevertheless, the supplemental report "gave an opinion specific to [Ellen's] exposures for the first time." *Id.* The court, in excluding the supplemental report, believed it was "too late in the day to spring something like that on the defense." Motions Argument, 8/17/21, at 19. Even assuming *arguendo* that Dr. Rigler's supplemental report contained nothing but simple multiplication, Appellees suggest that the late disclosure tethering Ellen to sustained talc usage left them with little opportunity to challenge the validity of the extrapolation made in this late report, likely through, *inter alia*, a refutational expert witness. **See** Appellees' Brief at 35.

The Kleiners do not directly refute the court's conclusion that "straight math," which is what they are arguing the supplemental report contained, does not fall under the auspice of an expert opinion. **See** Pa.R.E. 702(a) (requiring an expert opinion to contain "scientific, technical, or other specialized knowledge . . . beyond that possessed by the average layperson"). For that reason alone, the Kleiners have failed to demonstrate that the court committed an error of law or abuse of discretion in not allowing this late report.

Nevertheless, Appellees pivot from their earlier "straight math" premise and additionally aver that the supplemental report contained what is, in effect, complex testimony "that needed to be tested prior to trial." Appellees' Brief at 36 (identifying, *inter alia*, the lack of distinction in the supplemental report between asbestos fibers and fibrous talc).

We conclude that the supplemental report departed from the original report's thrust and scope: the supplemental report effectively transformed into an as-applied analysis of Ellen rather than an empirical study of other talc samples. As such, with this late disclosure of something inherently germane to the Kleiners' case in chief, Appellees were without the ability to adequately refute its contents, given how close the disclosure came to the eve of trial. Therefore, the Kleiners have failed to demonstrate the court committed an error of law or abuse of discretion in denying the admission of Dr. Rigler's supplemental report.[10]

In their third evidentiary claim, the Kleiners contend that the court improperly excluded evidence of: (1) a Health Canada Assessment

_____

[10] The Kleiners additionally challenge the court's admission of Dr. Jeffrey Boyd's supplemental expert report and a portion of Dr. Mark Sanchez's trial testimony. *See* Appellants' Brief at 39-40. The Kleiners argue that these two experts exceeded the scope of both of their original reports. Although arguments in connection with their expert testimony are argued in tandem with Appellants' discussion of Dr. Rigler's supplemental report's exclusion, they are wholly distinct, and largely undeveloped. *See* Pa.R.A.P. 2119(a) (requiring argument to be divided into as many parts as there are questions to be argued). Furthermore, the Kleiners do not cite to any new authority vis-à-vis their contention that the court erroneously admitted the report and testimony. Regardless, the court thoroughly addressed why the admission of Dr. Boyd's supplemental report and Dr. Sanchez's complained-of testimony were allowed. *See* Trial Court Opinion, 2/8/24, at 17-19. Specifically, both "new" opinions were consistent with their original opinions (or, alternatively, were analyses predicated on studies or reports put into evidence by the Kleiners) and thus not a surprise. As such, our review of the record leads us to conclude that there was no abuse of discretion or error of law in the court's decision to allow these two pieces of evidence.

demonstrating a "statistically significant causal association . . . between perineal talc use and ovarian cancer"; (2) other manufacturers' warnings as to "the risk of ovarian cancer from perineal use"; and (3) Johnson & Johnson's "2020 decision to discontinue selling its talc-based Baby Powder." Appellants' Brief at 42.

Beginning with the Health Canada Assessment, the Kleiners refer to its contents by its 46 pages of length, its citations to 249 different scientific sources, its references to peer-reviewed publications, and its overarching theme that it was the "first governmental agency to perform and publish a thorough review of the science considering the question of a causal relationship between the genital use of talcum powder and ovarian cancer." Appellants' Brief at 42-43. The Assessment concluded that there was a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer, indicative of a casual effect. The Kleiners argue that this Assessment should have been admitted given its close association with "much of the same peer-reviewed literature that was considered and relied upon by [their] experts." *Id.* at 43. Nevertheless, the Kleiners provide no authority to establish admissibility of a health report authored by the health agency of another country.

The court determined the Assessment to be both hearsay and irrelevant. As to hearsay, which is an out-of-court statement offered "in evidence to prove the truth of the matter asserted in the statement," Pa.R.E. 801(c), the court

noted our Supreme Court's decision in *Aldridge v. Edmunds*, 750 A.2d 292 (Pa. 2000), for the proposition that "if published material is authoritative and relied upon by experts in the field, although it is hearsay, an expert may rely upon it in forming his opinion." 750 A.2d at 297. However, such materials may not be offered "for their direct substantive effect" as opposed to providing an explanation as to "the basis for the expert's own opinion[.]" *Id.* (citation omitted). Here, the Health Canada Assessment was deemed to have been offered as substantive evidence of cancer causality.

As to relevance of the Assessment, the trial court concluded as follows:

> Health Canada applied a different standard than the [Food and Drug Administration ("FDA")] in reaching its conclusions regarding the carcinogenic nature of talc powder. The report itself states that "[t]he available data are indicative of a causal effect," and "[g]iven that there is potential for perineal exposure to talc from the use of self-care products . . . a potential concern for human health has been identified." Apart from sounding speculative and vague, the conclusions of a foreign regulatory body are irrelevant to the instant case where [Appellees] were not bound by the conclusions in their sale of Baby Powder in the United States.

Trial Court Opinion, 2/8/24, at 23 (citations omitted).

In summary, the court wrote that the Kleiners

> attempt to move the goalpost by arguing that the report is admissible where the authors reviewed the same data as [their] experts and reached the same conclusion. This is both misleading and irrelevant. First, it is misleading where the Health Canada report reached a conclusion based on a standard that is not applied by the FDA and therefore is not binding in any way on [Appellees'] sale of Baby Powder in the United States. Second, [the Kleiners] could have introduced the findings of the report through the testimony of their experts if done properly. Through the procedure described in *Aldridge*, [the Kleiners] could have asked their experts about the materials they relied upon as long

as the materials are not used for their "direct substantive effect" and rather used as a basis for describing the basis of the expert[']s opinion. Instead, [the Kleiners] sought to use the report specifically for the purpose prohibited in **Al[d]ridge**. Finally, [the Kleiners] are not prejudiced by this decision where they admit that their experts reviewed the same data that was reviewed in the report and came to their own conclusions. If that is the case, then the report is not only hearsay but also cumulative evidence that could mislead the jury[.]

**Id.** at 24 (citations omitted).

The Kleiners admitted that the Health Canada Assessment came out after their experts "formed their general causation opinion." Motions Argument, 8/16/21, at 49. The Kleiners also argued that the Assessment provided evidence that confirmed their experts' analysis. **See id.** Accordingly, we agree with the court that they sought to introduce this report as substantive evidence of truth, untethered to any of their experts' testimonies, which constituted inadmissible hearsay. **See Aldridge**, **supra**. Moreover, given that the Kleiners' experts utilized *the exact same peer-reviewed literature* that the Assessment contained and reached, broadly speaking, its same conclusion as to causality, the Kleiners have also failed to demonstrate that they have been prejudiced by the exclusion of this foreign agency's report.[11] Accordingly, no relief is due on this challenge.

_____

[11] As an ancillary matter, as has previously been stated, the report was generated by another country's health agency, subject to different standards and scrutiny levels than that of this country. Although the court found this country-based difference to render the report wholly irrelevant, adjudicating it to be inadmissible on that alternative basis, we do not reach the same

*(Footnote Continued Next Page)*

Next, as to the other talc body powder manufacturers' warnings on their products, the Kleiners argue that such evidence placed Appellees "on notice of the detrimental health effects of talc (and other constituent components of talc)." Appellants' Brief at 46. The Kleiners maintain that "[e]vidence of what other talc-based body powder manufacturers do is relevant evidence of industry standards, and evidence of whether [Appellees were] negligent (or malicious and wanton) in failing to comply with those standards by failing to warn." *Id.* The Kleiners then speculatively assert that, although the court found these competitors' warning labels to be irrelevant, "surely a warning label does not appear . . . instantaneously once the competitor finally appreciates the product's risks. Rather, the warning labels evidenced that the competitors were aware of the risks of talc-based powder long before the labels appeared, just as [Appellees] should have been." *Id.* at 47. We find no relief is due.

As indicated above, the court found that the competitor products that the Kleiners wanted to introduce into evidence were manufactured in 2018, *after* Ellen ceased using the Baby Powder. *See* Trial Court Opinion, 2/8/24, at 25. Thus, "[a]ny alleged harm that happened to [Ellen] had already occurred[,] and any warning [Appellees] put on their bottles would not have

---

conclusion that just because a medically-related report came from another country, it is *ipso facto* irrelevant.

reduced the harm which makes it a fact not of consequence to the case." *Id.* As such, the court concluded that the Kleiners failed to demonstrate that their pieces of evidence regarding post-injury competitor labeling were relevant, i.e., having a "tendency to make a fact more or less probable than it would be without the evidence[.]" Pa.R.E. 401.

We have explained that "testimony concerning industry standards and regulations may be admissible to determine the standard of care in a particular case[.]" *Nertavic v. PPL Elec. Utilities*, 100 A.3d 221, 243 (Pa. Super. 2014). However, other than reductively asserting that a warning label does not spontaneously appear, implying that cancer causality was increasingly known in the industry at some point in the past, the Kleiners have not provided any evidence of such industry standards and regulations during the relevant timeframe of Ellen's talcum powder use. As the only labels that were offered for admission post-dated the cessation of Ellen's use, there can be only one conclusion: that these labels would have prejudiced the jury by showing the jurors irrelevant evidence. Furthermore, it strains credulity to conclude that, because two competitors added warning labels, such actions imply an industry standard. Therefore, it was not an abuse of discretion for the court to exclude these labels as irrelevant.

At the third component of their third evidentiary claim, the Kleiners believe that Johnson & Johnson's discontinuance of Baby Powder in North America was "a quintessential evidentiary admission of a party opponent,

satisfying the hearsay exception of [Rule] 803(25), which is relevant to the issue of whether Appellees' Baby Powder is unreasonably dangerous and defective in the absence of appropriate warnings[.]" Appellants' Brief at 47; *see also* Pa.R.E. 803(25) (an opposing party's statement constitutes an exception to the hearsay rule, under certain conditions). The Kleiners assert that "the exclusion of this evidence was harmful error as it deprived [them] of relevant, poignant evidence in admissions made by [Appellees] to discontinue the very product at issue in this case." Appellants' Brief at 48.

The court found Appellees' decision to discontinue the manufacture of Baby Powder to constitute "a subsequent remedial measure" that was inadmissible. Trial Court Opinion, 2/8/24, at 25; *see also* Pa.R.E. 407 (establishing, *inter alia*, that evidence of subsequent measures are not admissible against that party to prove negligence, culpability, defect, or a need for warning if "measures are taken by a party that would have made an earlier injury or harm less likely to occur"). The court also found that, if the Kleiners were not, in fact, trying to introduce this evidence as indicia of a subsequent remedial measure, i.e. that Appellees "knew the harm that it was causing the consumers[,]" Trial Court Opinion, 2/8/24, at 26, then that other purpose was "irrelevant" and therefore inadmissible. *Id.* We agree.

We find that the Kleiners have not argued that evidence of Johnson & Johnson's decision to withdraw the product from the market would have been used for anything other than a violation of Rule 407. *See* Pa.R.E. 407.

Regardless of Appellees' argument as to why they discontinued the product, purportedly for financial reasons, the fact remains that the trial court found this action to constitute a subsequent remedial measure, a point that the Kleiners have not directly challenged in their brief. Instead, they exclusively aver that removal of the product is admissible as an opposing party admission under Rule 803(25). Without any analysis provided as to why the court was wrong in considering Appellees' action to constitute a subsequent remedial measure within the meaning of Rule 407, we conclude that the Kleiners have failed to demonstrate an error of law or abuse of discretion on this point. **See Schmidt**, **supra**. Accordingly, no relief is due on this challenge.

In their last evidentiary issue, the Kleiners suggest that the trial court abused its discretion by excluding documents that were created by Imerys, Johnson & Johnson's exclusive talc supplier. **See** Appellants' Brief at 49. The Kleiners argue that there was collusion "to suppress emerging science linking talc to ovarian cancer and to thwart any anticipated regulation of talc and any recognition that talc is carcinogenic to humans." **Id.** Substantively, the Kleiners contend that much of this evidence "was admissible for non-hearsay purposes, and several of the documents [fell] within well accepted hearsay exceptions." **Id.** Proceeding with the notion that these two companies were in a "conspiratorial relationship" with one another, the Kleiners suggest that Imerys' documents constituted an opposing party's statements against Appellees as they were made "by the party's coconspirator during and in

furtherance of the conspiracy." Pa.R.E. 803(25)(E). The Kleiners allege, without citation or record support, that "Johnson & Johnson has authored and seen internal Imerys documents detailing suppression and manipulation of science and regulatory authorities." Appellants' Brief at 50 (indicating that some of these documents were produced from Johnson & Johnson's own files). The Kleiners also argue that these documents fit the "state-of-mind" exception to the hearsay rule because of Imerys' "awareness of the risk of ovarian cancer associated with the use of talc[, which] evinces Imerys'[] corporate state of mind in colluding with [Johnson & Johnson] to suppress and manipulate the science and regulatory authorities regarding the products' safety." Appellants' Brief at 51; *see also* Pa.R.E. 803(3) (allowing for the admission of "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan)" as an exception to the hearsay rule). Lastly, the Kleiners contend that many of the documents fall within the business records exception to the hearsay rule, *see* Pa.R.E. 803(6), as they were made "at or near the time of [Johnson & Johnson's] collusion with Imerys and other talc-interested parties to conceal the dangerous effects of talc from the public and federal regulatory agencies." Appellants' Brief at 52. Furthermore, "these documents were kept in the course of the regularly conducted activity of recording and documenting company policies." *Id.* As their final point on this claim, the Kleiners refute the court's alternative invocation of the *Noerr-Pennington* doctrine, both generally, arguing that it does not apply at all, and then, more

specifically, as it would only be relevant to those "documents and statements addressed to governmental entities, which constitute a small amount of the relevant Imerys documents and evidence." *Id.* at 53. We find no relief is due.

Other than offering innuendo, the Kleiners have not, in their brief, demonstrated the existence of a legally-sufficient conspiracy between the Appellees and Imerys. Moreover, the Kleiners have failed to discuss Rule 803(25)(E)'s application to any specific documents.[12] Nevertheless, as succinctly stated by the court, for Rule 803(25)(E) to apply, "there needs to be a conspiracy. Without a conspiracy, there can be no coconspirators. Furthermore, in order to be a conspiracy[,] there needs to be an unlawful act or a lawful act for an unlawful purpose, [neither] of which are present in the instant case." Trial Court Opinion, 2/8/24, at 21-22. Therefore, because the Kleiners have failed to demonstrate the existence of a conspiracy, by even so much as a proffer as to what the specific nature of the conspiracy was or which documents were affected, they have necessarily failed to prove that the court committed an error of law or abuse of discretion in denying the admission of these Imerys documents. *Cf. id.* at 21 ("[T]he documents that were precluded by [the trial court] were produced solely by Imerys who, by the time of trial,

---

[12] Given these deficiencies, we could find waiver. *See Kituskie v. Corbman*, 682 A.2d 378, 383 (Pa. Super. 1996) ("Issues not properly developed or argued in the argument section of an appellate brief are waived.").

was not a party in the case.").[13]

As to the Kleiners' other theories regarding these documents, they admitted, before the court, that they were solely pursuing a conspiracy theory as the basis for their admissibility. **See** Motions Argument, 8/18/21, at 45. As such, the lack of any kind of contemporaneous objection congruent with the theories now advanced renders these current contentions waived for lack of preservation. **Cf.** Appellees' Brief at 56 ("The trial court could not possibly abuse its discretion by failing to consider hearsay exceptions that [the Kleiners] did not pursue during trial."); **see also** Pa.R.E. 103(a) (establishing that a party may claim error in the admission of evidence *only* when that party makes a timely and specific objection); **Parr v. Ford Motor Co.**, 109 A.3d 682, 709 (Pa. Super. 2014) (indicating that failure to make a contemporaneous objection waives an issue on appeal). Moreover, without qualifying which documents fall under which exception, we emphasize that it is not this Court's responsibility to comb through the record seeking the factual underpinnings of the Kleiners' claim. **See, e.g.**, **Commonwealth v. Mulholland**, 702 A.2d 1027, 1034 n.5 (Pa. 1997) ("In a record containing thousands of pages, this [C]ourt will not search every page to substantiate a

_____

[13] Furthermore, as Appellees point out, the Kleiners have "not cite[d] a single document that was erroneously excluded[.]" Appellees' Brief at 53. Without any identification of the *specific* documents that were improperly excluded, the Kleiners have, in effect, foreclosed on any particularized review of their claim.

party's incomplete argument."). In summary, the Kleiners have failed to demonstrate an abuse of discretion or error of law as it pertains to the court's denial of the Imerys documents; they are therefore due no relief.

Moving beyond their evidentiary challenges, the Kleiners' second averment challenges two discrete aspects of the instructions given to the jury, one that required the jury to disregard certain aspects of Dr. Smith-Bindman's testimony and another that allegedly misled the jury into believing that the Kleiners lacked expert support to prove factual causation necessary to their case.

Premised on those arguments, we note our standard of review for challenges to jury instructions is for an abuse of discretion:

> Our standard of review regarding jury instructions is limited to determining whether the trial court committed a clear abuse of discretion or error of law which controlled the outcome of the case. Error in a charge occurs when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. Conversely, a jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations.

*James v. Albert Einstein Med. Ctr.*, 170 A.3d 1156, 1163–64 (Pa. Super. 2017) (citation omitted). Stated differently,

> [e]rror in a charge is sufficient ground for a new trial if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. A charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to a fundamental error. In reviewing a trial court's charge to the jury we must look to the charge in its entirety.

***Quinby v. Plumsteadville Family Practice, Inc.***, 907 A.2d 1061, 1069-70 (Pa. 2006).

The court instructed the jury to "disregard only [the] portion of Dr. Smith-Bindman's testimony that [it] heard and any documents that [it was] shown about Dr. Smith-Bindman's systemic review and meta-analysis[.]" N.T. Afternoon Session, 9/22/21, at 27. The court indicated that the jury should "proceed as if the portion of Dr. Smith-Bindman's testimony regarding her systemic review and meta-analysis were never presented at this trial and that may not be part of the evidence that [it considers] in deliberations." ***Id.*** However, the jury was permitted to consider Dr. Smith-Bindman's other opinions as it would any other expert. ***See id.***

The Kleiners assert that because approximately one month elapsed between Dr. Smith-Bindman's testimony and the pronouncement of these jury instructions, "the instruction was so broad as to confuse the jury as to which aspects of Dr. Smith-Bindman's testimony could be considered and, further, improperly cast a cloud over all of Dr. Smith-Bindman's opinions." Appellants' Brief at 55.

The Kleiners have cited no authority in support of their argument, appearing to solely contend that the duration of time between Dr. Smith-Bindman's testimony and the partial striking of her testimony several weeks later is *ipso facto* evidence of a clear abuse of discretion or error of law which controlled the outcome of the case. Time, by itself, is not self-proving of

prejudice. *See Commonwealth v. Rough*, 418 A.2d 605, 611 (Pa. Super. 1980) ("The instructions need not be given immediately following the erroneous admission, but may occur later in the charge."). As Appellees indicate, we conclude that the Kleiners "fail to explain what portion of [the Dr. Smith-Bindman related instructions] they found wanting or what more the trial court could have said." Appellees' Brief at 60. Therefore, the Kleiners have failed to prove any reversible error in the jury instructions on Dr. Smith-Bindman's testimony.

As to the component of the Kleiners' claim that involves the court allegedly misleading the jury during its instructions, they first note that "the trial court added . . . non-standard language over [their] objection[.]" Appellants' Brief at 55. Specifically, the Kleiners cite this passage of the court's jury instruction:

> In a case like this, plaintiffs must establish with expert testimony that Johnson's Baby Powder was a factual cause of the plaintiff's injuries. In other words, that her perineal genital use of this product was a cause of her ovarian cancer. If the plaintiffs do not prove this through expert testimony, you must find for the defendants.

N.T. Afternoon Session, 9/22/21, at 39. The Kleiners claim that this instruction, which came "so soon after the trial court had instructed the jury to disregard critical portions of Dr. Smith-Bindman's expert factual causation testimony, had the improper effect of essentially directing a verdict in [Appellees'] favor on the issue of factual causation." Appellants' Brief at 56.

Although they emphasize that the court's instruction was non-standard,

which is not, by itself, a basis for reversal, the Kleiners do not further indicate that the complained-of instruction contained any misstatements of law. The court determined that, in accordance with the necessary elements of a successful products liability case, the Kleiners were required to prove causation through expert testimony. **See** Trial Court Opinion, 2/8/24, at 27; **see also Mitchell v. Shikora**, 209 A.3d 307, 315 (Pa. 2019) (noting that expert testimony is "an indispensable requirement in establishing a plaintiff's right of action, [in such cases where] the common knowledge or experience of a layperson is insufficient to form the basis for passing judgment"). Medical testimony, featuring the asserted causal relationship between a commercially available product and cancer, squarely fits under this "beyond a layperson" rule, with the trial court writing that this case involved knowledge of "geology, mineralogy, microbiology, and pathology[.]" Trial Court Opinion, 2/8/24, at 27. Accordingly, because expert testimony was necessary to establish causation, we conclude that the court's instructions accurately reflect the law and were sufficient to guide the jury in its deliberations, notwithstanding the Kleiners' undeveloped contention that this instruction, in combination with the instruction limiting Dr. Smith-Bindman's testimony, effectively directed a verdict in Appellees' favor. **See James, supra**; **see also Matthew 2535 Properties, LLC v. Denithorne**, 313 A.3d 223 (Pa. Super. 2024) (*en banc*) (indicating that undeveloped claims are waived on appeal) (citation omitted). Accordingly, the Kleiners are due no relief on this point.

Lastly, as to their third issue, the Kleiners argue that the non-traditional jury verdict slip placed "the question of factual causation at the forefront," which, they claim, caused them prejudice. Appellants' Brief at 57. Specifically, the verdict slip, at Question 1, read as follows: "Have [the Kleiners] proven by a preponderance of the evidence that JOHNSON'S® Baby Powder was a factual cause of [Ellen's] ovarian cancer?" Verdict Sheet at 1.

For claims that assert the defectiveness of the verdict slip, we note that "[t]he award of a new trial [in this domain] is proper only where a trial court has committed an error of law or abuse of discretion which may have affected the verdict." *Boyle v. Indep. Lift Truck, Inc.*, 6 A.3d 492, 494 (Pa. 2010).

The Kleiners aver that this case "involved not only product liability claims but also negligence claims. And when it comes to negligence claims, the proper issue before the jury is not whether a product caused injury, but rather whether the defendant's negligent conduct caused injury." Appellants' Brief at 58. As best can be discerned, the Kleiners contend that this verdict slip, in effect, "short-circuited" the jury's consideration of their claims, getting straight to the issue of causation, because they were not required to confront the discrete elements of traditional tort claims in order, i.e., duty, breach, causation, and damages. Instead, at the Kleiners' expense, the Appellees received an unwarranted benefit because "the question deemed most favorable to [the Appellees was placed] at the very beginning of the verdict slip[.]" *Id.* at 59.

The trial court explained its construction of the verdict slip in the following manner:

> Following a nearly six-week trial, the jury was sent out to deliberate with the verdict sheet as [its] guide. [The trial court], while at first disliking the verdict sheet, ultimately felt it was best to have factual cause as the first question. The logic behind the form of the verdict sheet is that factual cause is necessary for [the Kleiners] to prevail[,] so if the jury answers no, which [it] did, then deliberations are over, and [it has] reached a verdict. There is little sense in allowing the jury to deliberate for an indefinite time over other questions of negligence[] when factual cause could be dispositive.

Trial Court Opinion, 2/8/24, at 28.

After our review, we conclude that the Kleiners have failed to establish any material deficiency in the verdict slip; causation was at the crux of this case, if not *the* exclusive element in dispute.[14] Nevertheless, although they contest its "out of order" nature, the Kleiners have not shown that the court committed an error of law or abuse of discretion that may have affected the

---

[14] In response to the Kleiners' argument at this point, the Appellees have offered the following as to why the issue of causality featured first:

> [At the end of the day,] whether [Johnson & Johnson's] conduct caused [Ellen's] injury *was* simply a question [of] whether [its] talc caused [her] injury. [Ellen's] only alleged harm was her development of cancer. She claimed no connection to [Johnson & Johnson] aside from her use of [its] talc. There is no possible way, then, that [Appellees'] actions, *even if* theoretically negligent, could have caused [Ellen's] cancer *unless* [Johnson & Johnson's] talc caused [Ellen's] cancer.

Appellees' Brief at 70 (emphases in original).

verdict by constructing the verdict slip in the manner it did. ***See Boyle***, ***supra***. Simply put, the Kleiners have offered no authority to establish that verdict slips *must* be composed in a particular manner, i.e., following a specific ordinal sequence of elements, to survive appellate review. Absent clear evidence that the court erred by placing a case-dispositive question of causation first on the slip, the Kleiners' final issue in this appeal warrants no relief.

As none of the Kleiners' arguments provide any basis for reversal, we affirm the judgment in favor of the Appellees.

Judgment affirmed. Appellees' Application for Leave to File Post-Argument Submission denied as moot.

Judge Murray joins the memorandum.

Judge McLaughlin files a concurring/dissenting memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/28/2026